**WINSTAR CORPORATION, United Federal Savings Bank, Statesman Savings Holding Corp., the Statesman Group, Inc. and American Life and Casualty Insurance Company, and Glendale Federal Bank, FSB, Plaintiffs–Appellees,**

v.

**The UNITED STATES, Defendant–Appellant.**

**No. 92–5164.**

United States Court of Appeals, Federal Circuit.

May 25, 1993.

Order Granting Rehearing and Rehearing En Banc and Amending Opinion; Judgment Vacated and Opinion Withdrawn Aug. 18, 1993.

Charles J. Cooper, Shaw, Pittman, Potts & Trowbridge, Washington, DC, argued for plaintiffs-appellees, Winstar Corp. With him on the brief were Michael A. Carvin, Robert J. Cynkar and Vincent J. Colatriano. Jerry Stouck, Spriggs & Hollingsworth, Washington, DC, argued for plaintiffs-appellees, Glendale Federal Bank, FSB. With him on the brief were Joe G. Hollingsworth, Donald W. Fowler and Charles J. Fromm.

Douglas Letter, Appellate Litigation Counsel, Dept. of Justice, Washington, DC, argued for defendant-appellant. With him on the brief was Stuart M. Gerson, Asst. Atty. Gen.

Billie J. Ellis, Jr., Kelly, Hart & Hallman, Fort Worth, TX, was on the brief for amicus curiae, Keystone Holdings, Inc. and American Sav. Bank, F.A.

William H. Butterfield and Jed L. Babbin, McGuire, Woods, Battle & Boothe, Washington, DC, were on the brief for amicus curiae, The Electronic Industries Ass'n, The Shipbuilders Council of America, Inc. and Litton Industries, Inc.

Melvin C. Garbow, Peter M. Barnett, Peter T. Grossi, Jr., Matthew Frumin and Linda B. Coe, Arnold & Porter, Washington, DC, were on the brief for amicus curiae Amwest Sav. Ass'n and The Adam Corporation/Group; The Globe Sav. Bank, FSB and Phoenix Capital Group, Inc.; and Old Stone Bank, a Federal Sav. Bank and Old Stone Corp.

Timothy K. Irvine, Gen. Counsel, Franklin Federal Bancorp, Austin, TX, was on the brief for amicus curiae, Franklin Federal Bancorp.

Lloyd N. Cutler, William R. Richardson, Jr., Michael S. Helfer and Lydia R. Pulley, Wilmer, Cutler & Pickering, Washington, DC, were on the brief for amicus curiae, The Long Island Sav. Bank, FSA and The Long Island Sav. Bank of Centereach FSB. Also on the brief were Michael J. Chepiga and Eric S. Kobrick, Simpson, Thacher & Bartlett, New York City.

Herbert L. Fenster, Tami Lyn Azorsky, Mark A. Rowland and Hugo Teufel, III, McKenna & Cuneo, Washington, DC, were on the brief for amicus curiae, Chamber of Commerce of the U.S. of America. Also on the brief was Robin S. Conrad, National Chamber Litigation Center, Inc., Washington, DC.

Clarence T. Kipps, Jr. and Kevin C. Dwyer, Miller & Chevalier, Chartered, Washington, DC, were on the brief for amicus curiae, Aerospace Industries Ass'n of America, Inc. Also on the brief were Professor John Cibinic, Jr., The National Law Center, The George Washington University, Washington, DC, Kathleen A. Buck, Kirkland & Ellis, Washington, DC, Mac S. Dunaway and Gary E. Cross, Dunaway & Cross, Washington, DC.

Before NIES, Chief Judge, RICH and NEWMAN, Circuit Judges.

NIES, Chief Judge.

In an opinion dated July 24, 1992, in Cases Nos. 90–773C and 90–772C, the United States Claims Court[1] (Smith, C.J.) granted summary judgment in favor of plaintiffs Statesman Savings Holding Corp. and its affiliates and of plaintiff Glendale Federal Bank (FSB) on their breach of contract claims against the United States. Specifically, the court held that by enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), Pub.L. No. 101–73, 103 Stat. 183 (codified in relevant part at 12 U.S.C. § 1464), the United States breached the contractual obligations of the Federal Home Loan Bank Board to the plaintiffs by changing regulatory capital standards.[2] The court then consolidated these cases with *Winstar Corp. v. United States,* No. 90–8C, and certified for interlocutory appeal, pursuant to 28 U.S.C. § 1292(b), its opinions granting summary judgment as to liability in the consolidated cases.[3] Having granted the government permission to appeal, 979 F.2d 216 (Fed.Cir.1992), we now reverse the judgment of liability on the breach of contract claims of all plaintiffs and remand for further proceedings consistent herewith.

### I.

Much of the history of the savings and loan (or "thrift") industry consists of financial crisis followed by regulatory response. During the Great Depression, 40 percent of the nation's $20 billion in home mortgages went into default, 1700 of approximately 12,000 thrifts failed, and thrift depositors lost roughly $200 million. H.R.Rep. No. 54(I), 101st Cong., 1st Sess. 292 (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 88–89 ("*House Report*"). In response, Congress created the Federal Home Loan Bank Board (Bank Board) and the Federal Savings and Loan Insurance Corporation (FSLIC) to provide deposit insurance and to regulate the previously unregulated thrift industry. *See* Federal Home Loan Bank Act, Pub.L. No. 72–304, 47 Stat. 725 (1932) (codified as amended at 12 U.S.C. §§ 1421–1449 (1988)); Home Owners' Loan Act of 1933, Pub.L. No. 73–43, 48 Stat. 128 (1933) (codified as amended at 12 U.S.C. §§ 1461–1468 (1988)); and Title IV of the National Housing Act, Pub.L. No. 73–479, 48 Stat. 1246 (1934) (codified as amended at 12 U.S.C. §§ 1701–1750g (1988)). Pursuant to this and to subsequently enacted statutory authority, these agencies have "promulgated regulations governing 'the powers and operations of every Federal savings and loan association from its cradle to its corporate grave.'" *Fidelity Fed. Sav. & Loan Ass'n v. De La Cuesta,* 458 U.S. 141, 145, 102 S.Ct. 3014, 3017, 73 L.Ed.2d 664 (1982) (citing *California v. Coast Fed. Sav. & Loan Ass'n,* 98 F.Supp. 311, 316 (S.D.Cal.

---

[1]. Effective October 29, 1992, the United States Claims Court was renamed the "United States Court of Federal Claims" by the Federal Courts Administration Act of 1992, Pub.L. No. 102–572, § 902(a), 106 Stat. 4506, 4516 (1992).

[2]. The court's opinion is reported at *Statesman Sav. Holding Corp. v. United States,* 26 Cl.Ct. 904 (1992).

[3]. The court's opinion in the former case is reported as *Winstar Corp. v. United States,* 21 Cl.Ct. 112 (1990) ("*Winstar I*"), *modified,* 25 Cl.Ct. 541 (1992) ("*Winstar II*").

1951)). During their corporate lifetimes, thrifts are subject to rules that restrict their lending and investment activities, impose reporting and record-keeping requirements, limit (at times) interest paid on deposits, and authorize their termination and burial by government-appointed receivers. In short, the thrift industry has become "one of the longest regulated and most closely supervised of public callings." *California Hous. Sec., Inc. v. United States,* 959 F.2d 955, 958 (Fed.Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 324, 121 L.Ed.2d 244 (1992) (quoting *Fahey v. Mallonee,* 332 U.S. 245, 250, 67 S.Ct. 1552, 1554, 91 L.Ed. 2030 (1947)). This regulation and reform has converted the thrift industry into what Congress has described as "a federally-conceived and assisted system to provide citizens with affordable housing funds." *House Report* at 292; 1989 U.S.C.C.A.N. at 88.

Since their creation, the Bank Board and FSLIC have set minimum capital requirements—the regulatory function that is of interest in this appeal. As the Congress noted in the Committee Report on FIRREA:

> A sound tangible capital base is fundamental in promoting the safety and soundness of individual institutions and ultimately the stability of our financial system. Those institutions that operate without real capital are only risking the taxpayers' funds. With solid capital, losses related to risky activities are absorbed by the institutions' owners. Absent real and tangible capital, the first dollar lost is essentially an insurance fund dollar—with the losses ultimately borne by the taxpayer.

*House Report* at 429, 1989 U.S.C.C.A.N. at 225. These requirements have been the subject of numerous statutory and regulatory changes over the years. *See* Garn–St. Germain Depository Institutions Act, Pub.L. No. 97–320, 96 Stat. 1469 (1982) (codified throughout 12 U.S.C.); Depository Institutions Deregulation and Monetary Control Act, Pub.L. No. 96–221, 94 Stat. 132 (1980) (codified throughout 12 U.S.C. and at 15 U.S.C. §§ 1601–67 (1988)); Emergency Home Finance Act, Pub.L. No. 91–351, 84 Stat. 450 (1970) (codified throughout 12 U.S.C.). The regulations governing thrift capital reserve requirements changed three times in 1982 alone. *See* 47 Fed.Reg. 3543 (codified at 12 C.F.R. § 563.13); *id.* at 31859 (codified at 12 C.F.R. § 563.13); *id.* at 52961 (codified at 12 C.F.R. § 563.13).

## The "First" S & L Crisis of the 1980's, and the Bank Board's Response

The Bank Board significantly changed its regulatory capital standards in the early 1980's, in response to what was then the most severe industry crisis since the Great Depression. High inflation, coupled with a shift in Federal Reserve policy from stabilizing interest rates to controlling the money supply, had caused a dramatic increase in interest rates with an equally dramatic increase in the cost of funds to thrifts. *House Report* at 294–95, 1989 U.S.C.C.A.N. at 90–91. This meant that the thrifts had to pay more money to attract funds than they were earning on their long-term, fixed-rate mortgage portfolios. *Id.* For example, in August 1981, 53 percent of the thrift industry's interest-bearing liabilities were in short-term certificates of deposit paying high market rates of interest, while 85 percent of its assets were long-term mortgages fixed at below market interest rates. *Id.* at 296, 1989 U.S.C.C.A.N. at 92. The result of this unfavorable interest rate mismatch is not surprising. Thrifts lost about $4.5 billion in both 1981 and 1982. Eighty-one thrifts failed in 1981, 252 failed in 1982, and 102 failed in 1983. *Id.* FSLIC faced deposit insurance liability that threatened to exhaust the insurance fund. *See* Beesley, *FSLIC 1981 Annual Report,* FHLBB J., April 1982, at 16.

In 1981, the Bank Board and FSLIC decided this problem could be alleviated with greater incentives for the acquisition of failing thrifts by profitable institutions. The Chairman of the Bank Board testified that such acquisitions would result in "lower ultimate costs" to the FSLIC insurance fund than would a program of liquidation and payment of insured deposits. *Competition and Conditions in the Financial System: Hearings Before the Senate Comm. on Banking, Housing, and Urban Affairs,* 97th Cong., 1st Sess., pt. 1, at 100 (1981). An important acquisition "incentive" provided by the Bank Board was a change in the regula-

tory accounting principles applied to thrift acquisitions to include several significant departures from generally accepted accounting principles (GAAP). Before the enactment of FIRREA, the Bank Board had broad discretion to prescribe the accounting standards used to measure compliance with its regulatory capital requirements. *See* 12 U.S.C. § 1467 (Supp. V 1987). These changes were later characterized by the Congress as "accounting gimmicks." *House Report* at 297–98, 1989 U.S.C.C.A.N. at 93–94.

One of these accounting gimmicks was "supervisory goodwill," a concept that is explained by the Claims Court's opinion in *Winstar I*.

Under [the purchase method of accounting] ... the book value of the acquired thrift's assets and liabilities was adjusted to fair market value at the time of the acquisition. Any excess in the cost of the acquisition (which included liabilities assumed by the acquirer) over the fair market value of the acquired assets was separately recorded on the acquirer's books as "goodwill." In other words, the government agreed to allow the plaintiffs and others in similar circumstances to treat what was a deficit in capital as an asset. Goodwill was considered an intangible asset that could be amortized on a straight-line basis over a number of years. The difference between the aggregate fair market value of liabilities assumed by the acquirer and the aggregate fair market value of the failing thrift's assets was known as "supervisory goodwill," in the context of a supervisory merger, and was recorded on the resulting institution's balance sheet as an asset includable in capital for purposes of satisfying [the Bank Board's] minimum capital requirements.

21 Cl.Ct. at 113. With a wave of the accountant's pen, liabilities could be magically converted into assets; and the worse off the acquired thrift, the more the "supervisory goodwill" that could be booked as a capital asset for purposes of meeting regulatory capital requirements.

The other practice involved in this appeal is "regulatory accounting practice" (RAP)

goodwill. As the Court of Appeals for the Fifth Circuit explained:

When FSLIC provided cash assistance to the acquiror in connection with the acquisition, GAAP would have required that the amount of the assistance be treated as an asset of the acquired thrift, increasing that thrift's net worth and correspondingly decreasing the amount of goodwill that otherwise would have been created in the acquisition. FHLBB departed from GAAP, however, by permitting some or all of FSLIC's cash assistance to be recorded as a credit to the acquired thrift's new worth, without requiring that the amount of pre-assistance goodwill to be reduced. An asset equaling the amount of GAAP goodwill that otherwise would have been lost was termed "RAP goodwill."

*Security Sav. & Loan Ass'n v. Director, Office of Thrift Supervision,* 960 F.2d 1318, 1320 n. 5 (5th Cir.1992). Essentially, the RAP goodwill device permitted a double counting of any FSLIC monetary contribution—once as tangible capital, once as "goodwill" capital.

Allowing potential acquirors of ailing thrifts to book the full amount of supervisory and/or RAP goodwill as a capital asset stimulated many acquisitions that would have otherwise run afoul of regulatory capital requirements. As former Bank Board Chairman Richard Pratt stated in testimony before Congress:

The Bank Board was caught between a rock and a hard place. While it did not have sufficient resources to close all insolvent institutions, at the same time, it had to consolidate the industry, move weaker institutions into stronger hands and do everything possible to minimize losses during the transition period. Goodwill was an indispensable tool in performing this task. The GAAP approach to purchase method accounting mergers provided a bridge which allowed the Bank Board to encourage the necessary consolidation of the industry, while at the same time husbanding the financial resources which were then available to it.

*Savings and Loan Policies in the Late 1970's and 1980's: Hearings Before the House*

*Comm. on Banking, Finance and Urban Affairs,* 101st Cong., 2d Sess., No. 176, at 227 (1990). Each of the plaintiffs in this appeal participated in acquisitions whose viability was premised upon the Bank Board's then approved accounting practices.

## The Plaintiffs' Acquisitions of Failing Thrifts

Winstar (in combination with United Federal), Statesman (in combination with American Life and Casualty), and Glendale all acquired ailing thrifts under this program to encourage such acquisitions. Winstar and Statesman negotiated their acquisitions directly with the Bank Board and FSLIC;[4] Glendale's merger was expressly conditioned on FSLIC approval. In the Winstar and Statesman deals, the plaintiffs and FSLIC negotiated and fixed their respective cash contributions to the acquired thrift.[5] Pursuant to statutory authorization, 12 U.S.C. § 1464(d)(11) (1982), the Bank Board reviewed and approved all of the acquisitions, examining *inter alia* the thrifts' projected compliance with regulatory capital requirements, 12 C.F.R. §§ 546.2(h)(6), 563.13 (1982), in accordance with its accounting standards. 12 C.F.R. § 545.20 (1982).

Both Statesman and Winstar signed an "Assistance Agreement" with FSLIC. These agreements set forth FSLIC's promised monetary contribution and its other contractual responsibilities. None of these agreements expressly mention either purchase method accounting or supervisory goodwill. Both agreements, however, contain an "integration" clause which expressly incorporates any resolutions or letters of the Bank Board concerning the acquisition or merger in connection with its approval.

It is these letters and resolutions of the Bank Board that contain the only express reference to purchase method accounting or supervisory goodwill. On July 13, 1984, the Bank Board issued a "forbearance letter" confirming the following understanding respecting the Winstar acquisition: "For purposes of reporting to the Board, the value of any intangible assets resulting from accounting for the merger in accordance with the purchase method may be amortized by [United Federal] over a period not to exceed 35 years by the straight-line method." Similarly, in its March 11, 1988, resolution conditionally approving the Statesman acquisitions, the Bank Board acknowledged that "[t]he value of any unidentifiable intangible assets resulting from accounting for the Acquisition and the Mergers in accordance with the purchase method of accounting may be amortized ... over a period not in excess of twenty-five (25) years by the straight line method." The "forbearance letter" issued to Statesman mentions the $26 million "regulatory capital" credit for FSLIC's cash contribution but not supervisory goodwill.

Glendale acquired its failing thrift (First Federal) in a different regulatory environment. Unlike the transactions involving Winstar and Statesman, this merger was negotiated between the thrifts without the participation of the Bank Board or FSLIC. However, the Merger Agreement signed by Glendale and First Federal was expressly conditioned upon FSLIC approval. Shortly after the Merger Agreement was signed, FSLIC and Glendale signed a "Supervisory Action Agreement" that approved the merger and provided for financial assistance from FSLIC. This contract also contained an "integration clause" that incorporated contemporaneous resolutions and letters of the Bank Board.

As in the case of Winstar and Statesman, the Bank Board issued resolutions and a forbearance letter but none of these expressly approve either purchase method accounting or supervisory goodwill. Resolution No. 81–710 does require that Glendale furnish a satisfactory accountant's opinion within 60 days of the merger's effective date which

---

**4.** In the case of Winstar, the acquired thrift had authorized the Bank Board to negotiate a merger or consolidation. In the case of Statesman, the acquired thrifts were all in FSLIC receivership.

**5.** FSLIC contributed $5.5 million to the Winstar acquisition; Winstar contributed $2 million.

FSLIC contributed $60 million to the Statesman acquisitions; Statesman contributed $21 million. FSLIC apparently made some cash contribution to the Glendale acquisition, but the specific amount is not of record.

justifies the use of purchase method accounting, describes "any goodwill or discount of assets arising from the merger to be recorded on Glendale's books," and substantiates the reasonableness of amounts so booked and the resulting amortization periods and methods. Glendale was further obligated to submit a stipulation that any goodwill arising from the merger be determined and amortized in accordance with a Bank Board memorandum (R–31b) which describes its standards for the computation and use of supervisory goodwill arising from thrift mergers. On March 19, 1982, Glendale supplied the required opinion letter, setting forth its intention to amortize approximately $716 million of supervisory goodwill over a 40 year period and $18 million over 12 years. There is no evidence that the government regulators found this proposal unsatisfactory.

Supervisory goodwill was critical to all of these acquisitions. Even with the monetary contributions of Winstar and FSLIC, the GAAP net worth of the thrift created by the Winstar transaction amounted to approximately a *negative* $6.7 million dollars. This capital shortfall was met by the $10.6 million in goodwill that was created by the purchase method accounting applied to this transaction. Similarly, the thrift created by the Statesman acquisitions was able to meet regulatory capital standards only because of the $25.8 million in supervisory goodwill and the $26 million regulatory capital credit generated in the transaction. The value of these "assets" is roughly equal to FSLIC's potential liability had the four failing thrifts that Statesman acquired been liquidated. In the case of Glendale, even with its capital reserve of $277 million and with FSLIC's contribution to the merger, the resulting thrift was left with an immediate GAAP capital deficiency of $460 million, which was met by more than $700 million of supervisory goodwill generated by the merger. Had either Winstar, Statesman, or Glendale been unable to count this goodwill as capital, its newly created thrift would have been subject to immediate liquidation.

*The "Second" S & L Crisis of the 1980's and FIRREA*

Subsequent to all these transactions, Congress enacted FIRREA. This sweeping reform of the thrift industry was compelled by the "precarious financial condition" of the FSLIC insurance fund and by waning consumer confidence in the savings and loan industry. *House Report* at 302, 1989 U.S.C.C.A.N. at 98. As of December 31, 1988, FSLIC was $56 billion in the red. *Id.* at 304, 1989 U.S.C.C.A.N. at 100. Consumer fears regarding the stability of the industry resulted in record withdrawals—$28.5 billion in the first *quarter* of 1989, compared with a previous record *annual* withdrawal of $25 billion in 1980. *Id.* at 305, 1989 U.S.C.C.A.N. at 101.

Among the reforms implemented in FIRREA were the abolition of FSLIC and the Bank Board, with a transfer of FSLIC's insurance function to the Federal Deposit Insurance Corporation (FDIC) and a transfer of the Bank Board's regulatory function to the newly created Office of Thrift Supervision (OTS), under the supervision of the Department of the Treasury. *Id.* at 310, 1989 U.S.C.C.A.N. at 106. The abolition of the Bank Board was motivated in part by Congress's perception that the Bank Board's relaxed capital standards and sluggish regulatory enforcement, which contributed to the thrift crisis, were the product of an agency mission directed more toward promoting than toward regulating the industry. *Id.* at 302, 1989 U.S.C.C.A.N. at 98.

These capital standards were the target of specific legislation, and of congressional ire. Goodwill was described as "one of the remaining poisons of the savings and loan industry." 135 Cong.Rec. H2710 (daily ed. June 15, 1989) (statement of Rep. Price). As one member of Congress noted:

> Goodwill is not cash. It is a concept, and a shadowy one at that. When the Federal government liquidates a failed thrift, goodwill is simply no good. It is valueless. That means, quite simply, that the taxpayer picks up the tab for the shortfall.

*Id.* at H2571 (statement of Rep. Barnard). Intangible capital assets generated by the Bank Board's use of accounting gimmickry "masked the worsening financial condition of the industry, and the FSLIC, and enabled many weak institutions to continue operating

with an increasingly inadequate cushion to absorb future losses." *House Report* at 298, 1989 U.S.C.C.A.N. at 94. At the time FIRREA was enacted, supervisory goodwill accounted for $18 billion in regulatory capital. *Id.* at 497, 1989 U.S.C.C.A.N. at 293 (additional views of Reps. Annunzio, Kanjorski and Flake).

FIRREA charged OTS with developing and implementing "uniformly applicable capital standards for savings associations." 12 U.S.C.S. § 1464(t)(1)(A) (Law. Co-op.1992). But unlike previous legislation, FIRREA severely restricted the agency's discretion to set these standards, requiring a "leverage limit," a "tangible capital requirement," and a "risk-based capital requirement." *Id.* The "leverage limit" to be promulgated by OTS would require a thrift to "maintain core capital in an amount not less than 3 percent of [its] total assets." 12 U.S.C.S. § 1464(t)(2)(A). Similarly, OTS was obligated to set standards requiring thrifts "to maintain tangible capital in an amount not less than 1.5 percent of ... total assets," 12 U.S.C.S. § 1464(t)(2)(B), and to meet risk-based capital requirements that were not materially lower than those applicable to national banks. 12 U.S.C.S. § 1464(t)(2)(C). FIRREA expressly excluded intangible assets such as goodwill from its definition of "tangible capital." 12 U.S.C.S. § 1464(t)(9)(C). It also expressly limited the quantity of supervisory goodwill (expressed as a percentage of total assets) that could be included in "core capital," gradually reducing the allowed percentage to zero by the end of 1994, 12 U.S.C.S. § 1464(t)(3), and limiting to twenty years the amortization period in the interim. 12 U.S.C.S. § 1464(t)(9)(B). Subsequently, OTS promulgated capital regulations that included a similar phase-out schedule for the risk-based capital standards. 12 C.F.R. § 567.6(a) (1991).

With the passage of FIRREA, Winstar, Statesman, and Glendale had serious difficulties meeting the new statutory capital requirements. Both Winstar and Statesman are now in receivership.[6] Glendale avoided noncompliance, and thus shutdown, only by undergoing a costly and extensive restructuring.[7]

*FIRREA Litigation in the District Courts*

A number of thrifts, which like the plaintiffs here had made acquisitions in the early to mid–1980's, sued OTS in the district courts, seeking injunctions against the enforcement of the new statutory and regulatory capital standards against them. In each case, the thrifts advanced similar arguments. The thrifts contended that a savings provision of FIRREA, codified at 12 U.S.C. § 1437(a), prevented abrogation of the Bank Board's "agreements," as expressed in the resolutions, forbearance letters, and the like, regarding the regulatory treatment of goodwill assets generated in those mergers that it had approved. The thrifts argued further that, if FIRREA were construed to abrogate these "agreements," enforcement of these new capital standards would constitute a taking without just compensation in violation of the Fifth Amendment. A number of thrifts obtained short-lived victories in the district courts preventing OTS from enforcing these standards against them. However, without exception these decisions were reversed on appeal. *Guaranty Fin. Servs., Inc. v. Director, Office of Thrift Supervision,* 742 F.Supp. 1159 (M.D.Ga.1990), *rev'd,* 928 F.2d 994 (11th Cir.1991); *Far W. Fed. Bank, S.B. v. Director, Office of Thrift Supervision,* 746 F.Supp. 1042 (D.Or.1990), *rev'd,* 951 F.2d 1093 (9th Cir.1991); *Security Sav. & Loan Ass'n v. Director, Office of Thrift Supervision,* 761 F.Supp. 1277 (S.D.Miss.1991), *rev'd,* 960 F.2d 1318 (5th Cir.1992); *Carteret Sav. Bank, F.A. v. Office of Thrift Supervision,* 762 F.Supp. 1159 (D.N.J.1991), *rev'd,* 963 F.2d 567 (3d Cir.1992).[8]

---

6. Even if Winstar had been able fully to count goodwill as regulatory capital, it may have failed nonetheless to meet the new statutory capital requirements. *See Statesman,* 26 Cl.Ct. at 924.

7. Despite this restructuring, Glendale fell out of compliance with one of the regulatory capital standards in March of 1992. As of this date, it is still operating and has not been placed in receivership.

8. In one case, a district court held that these forbearances were contractual obligations of the government, breached by FIRREA, and ordered recision as an appropriate remedy. *Charter Fed. Sav. Bank v. Director, Office of Thrift Supervision,*

Following the lead of the Courts of Appeals for the Eleventh Circuit in *Guaranty Fin. Servs., Inc. v. Ryan*, 928 F.2d 994, 996 (11th Cir.1991), and for the Sixth Circuit in *Franklin Fed. Sav. Bank v. Director, Office of Thrift Supervision*, 927 F.2d 1332 (6th Cir.1991), the courts of appeals have unanimously held that FIRREA's "savings provision" does not exempt from its regulatory capital standards the supervisory goodwill created by these alleged "agreements" with the Bank Board. *See Security Sav. & Loan; see also Charter Fed. Sav. Bank v. Office of Thrift Supervision*, 976 F.2d 203 (4th Cir. 1992); *Carteret Sav. Bank, F.A. v. Office of Thrift Supervision*, 963 F.2d 567 (3d Cir. 1992); *Transohio Sav. Bank v. Director, Office of Thrift Supervision*, 967 F.2d 598 (D.C.Cir.1992); *Far W. Fed. Bank, S.B. v. Director, Office of Thrift Supervision*, 951 F.2d 1093 (9th Cir.1991). With respect to the requests for injunctions, the courts of appeals were nearly unanimous in declining to address the merits, holding that a claim for damages under the Tucker Act would be the appropriate remedy, if any, for an asserted takings claim. *Carteret*, 963 F.2d at 581–83, *Franklin Fed.*, 927 F.2d at 1341; *Far W. Fed. Bank*, 951 F.2d at 1100. *Cf. Transohio*, 967 F.2d at 612–13 (finding jurisdiction in the district courts over claims for specific (rather than monetary) relief under contract and takings theories). The two courts of appeals that have addressed a breach of contract-related issue held that the thrifts before them had not contracted with the government for the specific regulatory treatment of previously authorized supervisory goodwill. *Transohio*, 967 F.2d at 618–24; *Charter Fed.*, 976 F.2d at 210–213.

### Court of Federal Claims Litigation

As the government was accumulating its victories in the courts of appeals, Winstar, Statesman, Glendale, and a number of other thrifts similarly situated were prosecuting suits in the United States Claims Court, now the Court of Federal Claims. The plaintiffs claim, *inter alia*, that FIRREA's regulatory capital requirements, as implemented by OTS, breached their contracts with the government by repudiating the regulatory treatment of goodwill that they had been promised by the Bank Board.

Winstar's contract claim was the first decided. On cross-motions for summary judgment, the trial court ruled that Winstar had an implied-in-fact contract with the government under which it "would be permitted to continue to treat supervisory goodwill as a capital asset and to amortize it for 35 years, regardless of changes in generally accepted accounting principles (GAAP) or in regulatory policy." *Winstar I*, 21 Cl.Ct. at 115.[9] The court concluded that this contract did not impair the power of Congress to regulate, but Winstar was entitled to damages for the resulting breach of the contract. *Id.* at 116. The court analogized Winstar's claim to a suit for compensation under the Fifth Amendment, in which one accepts the power of Congress to regulate but requests compensation for the exercise of that power. *Id.*

After additional briefing, and on the government's request for clarification, the court issued a second opinion, affirming its previous holding that an implied in fact contract existed giving Winstar a right to treat supervisory goodwill as a capital asset for 35 years and holding that the government breached this right when Congress enacted FIRREA limiting the amortization period to 20 years. *Winstar II*, 25 Cl.Ct. at 549. The court discussed at length and distinguished the Supreme Court's decision in *Bowen v. Public Agencies Opposed to Social Sec. Entrapment*, 477 U.S. 41, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986) (*POSSE*), on the ground it did not involve a contract. In *POSSE*, the Court held that Congress could abrogate, as it did, the right a state previously had to withdraw from the Social Security system. *Id.* Finally, the Claims Court concluded that because the regulatory capital reforms of FIRREA were enacted "to take away the plaintiffs' rights to use supervisory goodwill" and not

773 F.Supp. 809 (W.D.Va.1991), *rev'd*, 976 F.2d 203 (4th Cir.1992).

**9.** The court did not rely upon the Assistance Agreement in reaching this conclusion. Rather,

it cited the forbearance letter, as well as several internal Bank Board documents, as evidence of the government's "intent." *Winstar I*, 21 Cl.Ct. at 115.

for the public good, the government was not absolved of contract liability under the "Sovereign Acts Doctrine." 25 Cl.Ct. at 551–53.

Applying its *Winstar* analysis, the trial court also granted summary judgment in favor of Statesman and Glendale in *Statesman Sav. Holding Corp. v. United States,* 26 Cl. Ct. 904 (1992). In these instances, however, the court found express, rather than implied-in-fact contracts. Specifically, the court found that the integration clause of the Statesman Assistance Agreement incorporated contemporaneous Bank Board resolutions into the contract. *Statesman,* 26 Cl.Ct. at 912. Because the Bank Board resolution approving the Statesman merger provided for the use of the purchase method of accounting, "the government and Statesman had an express contract for the use of that accounting method." *Id.* The court similarly found, based upon the contemporaneous documents in the Glendale transaction, that the government had entered into an express contract under which the Bank Board "agreed to forebear from exercising its authority to bring enforcement proceedings against Glendale for failure to meet regulatory capital standards." *Id.* at 913. Finding that "the government possessed no contractually-based right allowing it to abrogate without liability the parties' express contract," the court held the enactment of FIRREA to be a breach of these contracts not within the scope of the Sovereign Acts Doctrine. *Id.* at 915. The court then consolidated these cases with *Winstar* and certified for interlocutory appeal its decisions holding the government liable on the plaintiffs' breach of contract claims. *Id.* at 924.

## II.

The government does not dispute that the Bank Board and FSLIC understood that the purchase method of accounting would be applied to these mergers, that the resulting supervisory goodwill would be booked as regulatory capital, and that amortization over a period longer than 20 years was approved. Nor does it dispute this understanding was memorialized in contemporaneous documents—the resolutions and forbearance letters. Conversely, the thrifts do not dispute

that the government allowed them to proceed in accordance with their understanding until enactment of FIRREA. The dispute here concerns not what was agreed to at that time but whether the parties further agreed that there would be no change in accounting and capital requirements.\*

The government contends these documents were made in the exercise of the Bank Board's regulatory function and represent a statement of compliance with then-existing statutory and regulatory requirements which requirements, however, were subject to change. The plaintiffs contend and the Claims Court found that these documents were generated by the Bank Board acting in a contractual capacity and that the statements therein regarding the amortization of supervisory goodwill over periods of twenty to forty years constituted an unconditional promise by the Bank Board to that time period which was specifically bargained for by the plaintiffs and subsequently breached by Congress.

■ The syllogism advanced by the plaintiffs and the Claims Court is that the "government" entered a contract and the "government" breached a contract by enacting FIRREA, treating both the legislative and the executive branches as the contracting entity labelled the "government." If we assume the "government" (Bank Board, FSLIC) promised that the plaintiffs could continue the treatment of the "goodwill" created by the merger as regulatory capital, the "government" (Congress) then reneged by enacting FIRREA's capital reforms. *Quod erat demonstrandum.* However, the merger of the Bank Board's purported obligations under these contracts with the exercise of Congress's power to legislate for the general public good is too simplistic. As the Supreme Court has admonished, "[T]he two characters which the government possesses as a contractor and as a sovereign cannot be thus fused." *Horowitz v. United States,* 267 U.S. 458, 461, 45 S.Ct. 344, 344, 69 L.Ed. 736 (1925) (quoting *Jones & Brown's Case,* 1 Ct.Cl. 383, 384, 1865 WL 1976 (1865)). Congress frequently enacts legislation affecting the performance of contracts (both private and governmental), creating additional bene-

---

\* Editor's Note: Amended on Rehearing, see p. 819.

fits to and/or burdens upon the contracting parties. In the case of private parties, the burden of such a change in the law (or the benefit) is usually borne (or enjoyed) by the party on which it falls, unless responsibility is otherwise assigned in the contract.[10] Similarly, when the United States is sued as a contractor, the "Sovereign Acts Doctrine" absolves it of liability "for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign." *Horowitz*, 267 U.S. at 461, 45 S.Ct. at 344 (Railroad Administration embargo on shipments of silk); *see also Atlas Corp. v. United States*, 895 F.2d 745, 754–55 (Fed. Cir.), *cert. denied*, 498 U.S. 811, 111 S.Ct. 46, 112 L.Ed.2d 22 (1990) (the Uranium Mill Tailings Radiation Control Act); *Tony Downs Foods Co. v. United States*, 209 Ct.Cl. 31, 530 F.2d 367 (1976) (Executive Order lifting price freeze); *J.B. McCrary Co. v. United States*, 114 Ct.Cl. 12, 84 F.Supp. 368 (1949) (Executive Order freezing labor wages); *Gothwaite v. United States*, 102 Ct. Cl. 400, 1944 WL 3658 (1944) (regulations of War Production Board).

■ Unlike the doctrine of sovereign immunity, the Sovereign Acts Doctrine does *not* confer a privilege upon the government that would not be enjoyed by private parties. To the contrary, it ensures that parties contracting with the government will not have rights against the government that the same contract would not afford against a private party. As the Supreme Court explained:

> In this court the United States appear simply as contractors; and they are to be held liable only within the same limits that any other defendant would be in any other court. Though their sovereign acts performed for the general good may work injury to some private contractors, such parties gain nothing by having the United States as their defendants.

*Horowitz*, 267 U.S. at 461, 45 S.Ct. at 344 (quoting *Jones*, 1 Ct.Cl. at 384).

A private party does not necessarily promise that Congress will act only for the benefit of his promisee's interests under the contract. He is liable for detrimental actions only to the extent provided for in the contract. Likewise, the sovereign acts of the government are not automatically swept within the scope of performance to which it is bound by the promises of its contracting agents. Warranties as to the state of the law are not implied between private parties. Nor may such warranties be implied against the government when it acts in its contracting role. As in the case of private parties, the government bears responsibility for FIRREA's change in regulatory capital standards only to the extent that the plaintiffs, the Bank Board, and FSLIC have provided in their contracts.

■ On the other hand, every act of Congress does not *ipso facto* fall within the Sovereign Acts Doctrine. The United States cannot repudiate its contractual obligations with impunity merely by acting through Congress. *See Perry v. United States*, 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912 (1935) (invalidating legislation authorizing the redemption of United States Liberty Bonds in currency other than gold); *Lynch v. United States*, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934) (invalidating legislation repudiating the government's obligation to pay war risk insurance benefits to veterans).

■■ The Claims Court found that the purpose of FIRREA "was to take away *plaintiffs' rights* to use supervisory goodwill," *Winstar II*, 25 Cl.Ct. at 552 (emphasis added). We cannot agree. Rather we conclude that FIRREA's capital reforms are "general and public" acts to which the Sovereign Acts Doctrine applies. Congress found that "[t]o a considerable extent, the size of the thrift crisis resulted from the utilization of capital gimmicks that masked the inadequate capitalization of thrifts." *House Re-*

---

**10.** *See Northern Indiana Public Serv. Co. v. Carbon County Coal Co.*, 799 F.2d 265, 278 (7th Cir.1986); *Connick v. Teachers Ins. & Annuity Ass'n*, 784 F.2d 1018, 1022 (9th Cir.), *cert. denied*, 479 U.S. 822, 107 S.Ct. 91, 93 L.Ed.2d 43 (1986); *Haby v. Stanolind Oil & Gas Co.*, 228 F.2d 298, 306 (5th Cir.1955); *Sabine Corp. v.*

*ONG W., Inc.*, 725 F.Supp. 1157, 1177 (W.D.Okla.1989); *Hanover Petroleum Corp. v. Tenneco Inc.*, 521 So.2d 1234, 1240 (La.App. 3d Cir.), *cert. denied*, 526 So.2d 800 (La.1988); *Sheldon–Seatz, Inc. v. Coles*, 319 Mich. 401, 29 N.W.2d 832, 835 (1947).

*port* at 310, 1989 U.S.C.C.A.N. at 106. In addition to banning future gimmickry, Congress chose to "unmask" that which had been practiced in the past. As Congressman Schumer noted in his Additional Views to the Committee Report:

> Not counting goodwill would cause some thrifts that appear to have adequate capital with goodwill counted not to be in compliance with the standards. These thrifts argue that by not including goodwill in capital, the government would be taking healthy thrifts and making them unhealthy. But whether a thrift is financially healthy does not depend on how capital is defined. Clearly, lowering the capital standards so that all thrifts no matter how weak are in compliance would not magically make all weak thrifts strong. Similarly, allowing undercapitalized thrifts to count gimmicks as capital does not make them any better capitalized nor any less of a threat to the taxpayers.

1989 U.S.C.C.A.N. at 408. The touchstone of the cases recognizing a sovereign act is that the congressional action had general applicability for the public good. That is the case here. Plaintiffs were not singled out as targets.[11] The accounting methods which had been approved were disapproved for all of the industry because of the perceived harm to the public. Nor, we might add, did all thrifts which had taken over failing thrifts fail as a result of this general legislation.

In any event, concluding as we do that the FIRREA legislation falls within the Sovereign Acts Doctrine does not end the inquiry here. As indicated, where a change in the law affects performance under a contract between private parties, a court must review the contract to determine which party bore the risk of such change. Thus, we must make a similar analysis of the subject agreements, the matter to which we now turn.

## III.

■ Contract interpretation presents a question of law that we review *de novo. Reliance Ins. Co. v. United States,* 931 F.2d 863, 865 (Fed.Cir.1991). The government contends that the contracts between the plaintiffs, FSLIC, and the Bank Board cannot be construed so as to obligate the Bank Board to measure regulatory capital in a manner inconsistent with what Congress later required in FIRREA. We agree.

In concluding that contracts similar to those present in this case did not obligate the Bank Board to regulate contrary to FIRREA, the Court of Appeals for the District of Columbia Circuit applied "the rule of construction laid down by the Supreme Court, that one who wishes to obtain a contractual right against the sovereign that is immune from the effect of future changes in law must make sure that the contract confers such a right in unmistakable terms." *Transohio,* 967 F.2d at 618 (quoting *Western Fuels–Utah, Inc. v. Lujan,* 895 F.2d 780, 789 (D.C.Cir.), *cert. denied,* 498 U.S. 811, 111 S.Ct. 47, 112 L.Ed.2d 24 (1990)). *Accord Charter Fed.,* 976 F.2d at 212 (applying rule to Bank Board resolutions); *Guaranty Fin. Servs.,* 928 F.2d at 998–1000 (applying rule to Bank Board forbearance letter referenced in Capital Maintenance Agreement between the thrift and FSLIC). This "unmistakeability" doctrine is derived primarily from the decision of the Supreme Court in *POSSE, supra,* in which certain State and public agencies argued they had contract rights (arising from so-called "Section 418 Agreements" with the Secretary of Health and Human Services) to withdraw from the Social Security System that were breached by Congress's enactment

---

**11.** The following two cases cited by the dissent which addressed an agency defense to a clear breach of contract (not congressional action) on the ground that it falls within the Sovereign Acts Doctrine are inapt. As indicated, the Sovereign Acts Doctrine may not be invoked where only particular contracts are the targets of legislation repudiating a government obligation to a specific party. The same would be true of agency action. *See Everett Plywood Corp. v. United States,* 227 Ct.Cl. 415, 651 F.2d 723, 732 (1981) (Agency's termination of single logging contract for environmental reasons not sovereign act. "[It] would have been an entirely different case if Congress had passed a law immediately prohibiting all cutting in all public forests"); *Sun Oil Co. v. United States,* 215 Ct.Cl. 716, 572 F.2d 786, 817 (1978) (Secretary of Interior's actions were not "actions of public and general applicability, but were actions directed principally and primarily at plaintiff's contractual right to install a [particular oil] platform.").

of section 103 of the Social Security Amendments Act of 1983, Pub.L. No. 98–21, 97 Stat. 71 (codified at 42 U.S.C. § 418(g) (1988)). 477 U.S. at 50, 106 S.Ct. at 2395. In rejecting this contention, the Court noted that "sovereign power, even when unexercised, is an enduring presence that governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms." *POSSE*, 477 U.S. at 52, 106 S.Ct. at 2396 (quoting *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 148, 102 S.Ct. 894, 907, 71 L.Ed.2d 21 (1982)). Construing the Section 418 Agreements "to avoid foreclosing exercise of sovereign authority," *POSSE*, 477 U.S. at 53, 106 S.Ct. at 2397, the Court concluded these Agreements were subject to Congress's power to alter the Social Security law. *Id.* at 54, 106 S.Ct. at 2397.

■ The plaintiffs posit that this rule of construction is applicable only where Congress has expressly reserved its power to amend a statute, *see Sinking–Fund Cases*, 99 U.S. (9 Otto) 700, 720–21, 25 L.Ed. 496 and 504 (1879), or where the subject contract expressly incorporates a statute that is subject to amendment. *See POSSE*, 477 U.S. at 53–54, 106 S.Ct. at 2397. The first proposition is ludicrous. An express reservation of the power to amend, be it in the Banking Code, the Internal Revenue Code, the Lanham Act or any other congressional enactment, is not a prerequisite to the exercise of that power. Congress may amend statutes as part of its constitutional authority to legislate. This authority is ubiquitous even if not expressly acknowledged or reserved. *See Education Assistance Corp. v. Cavazos*, 902 F.2d 617, 629 (8th Cir.), *cert. denied*, 498 U.S. 896, 111 S.Ct. 246, 112 L.Ed.2d 205 (1990) (citing *POSSE* and recognizing Congress' power to amend a statute). The plaintiffs were on notice that Congress had altered in the past and could alter in the future the statutory/regulatory burdens to which they were subject. *California Hous. Sec.*, 959 F.2d at 959. Nor was it incumbent upon the parties to expressly acknowledge that their performance, whether contractual or otherwise, must conform to applicable law.

For a regulatory agency like the Bank Board to abdicate by contract its duty to regulate in accordance with subsequent acts of Congress requires, at the very least, an unmistakable statement of its intent to do so. But we question whether even this would suffice. The Court has stated that the government's power as a sovereign "cannot be contracted away." *North Am. Commercial Co. v. United States*, 171 U.S. 110, 137, 18 S.Ct. 817, 828, 43 L.Ed. 98 (1898). More recently, it has noted, in the context of the Contract Clause, that a State need not "adhere to a contract that surrenders an essential attribute of its sovereignty." *United States Trust Co. v. New Jersey*, 431 U.S. 1, 23, 97 S.Ct. 1505, 1518, 52 L.Ed.2d 92 (1977). As Justice Brennan stated in dissent:

> One of the fundamental premises of our popular democracy is that each generation of representatives can and will remain responsive to the needs and desires of those whom they represent.... The Framers fully recognized that nothing would so jeopardize the legitimacy of a system of government that relies upon the ebbs and flows of politics to "clean out the rascals" than the possibility that those same rascals might perpetuate their policies simply by locking them into binding contracts.

*United States Trust*, 431 U.S. at 45, 97 S.Ct. at 1529; *see also Transohio*, 967 F.2d at 620–24. To this we add our own observation that because private parties cannot hope to curtail by contract the sovereign acts of Congress, *Horowitz* and its progeny would suggest that the government's agents of the executive branch, acting by way of contracting authority, cannot do so either.

■ We need not decide here, however, whether an agency's putative waiver of sovereign authority would ever be enforceable. None of the contracts in this appeal contain language that, under the strict rule of construction in *POSSE*, would obligate the Bank Board to regulate in a manner inconsistent with subsequent acts of Congress. The plaintiffs assert and the Claims Court found such an obligation in the forbearance letters and Bank Board resolutions *supra*, in which the government recognized that intangible assets could be counted as regulatory capital.

At most, these statements acknowledge the permissibility at that time of that accounting procedure. They do not commit the Bank Board to a future course of performance under an immutable regulatory standard. The thrifts point to the approved amortization periods for supervisory goodwill of several decades as precluding a change. However, the length of the amortization periods of these intangible assets simply reflects compliance with the Bank Board's then-existing regulations and accounting standards.[12] The Bank Board's acknowledgment that these time periods were acceptable *at the time of the mergers* is not an acknowledgement that the law or even regulations would allow treatment of supervisory goodwill as regulatory capital throughout the entire amortization periods. *See Charter Fed.,* 976 F.2d at 211 ("The resolutions issued by the [Bank Board] in connection with the mergers merely granted the agency's approval of the merger and the accounting practices employed by Charter in connection therewith.") No *promise* was made committing the Bank Board to maintenance of the same capital treatment over the various amortization periods. *See Transohio,* 967 F.2d at 619 (passive language in forbearance letters too ambiguous to satisfy the *POSSE* rule).

To the contrary, we conclude that the plaintiffs assumed the risk that the law would change. The Supervisory Assistance Agreement with Glendale acknowledges that "[n]othing in this Agreement shall require any unlawful action or inaction by either of the parties hereto." Similarly, both the Winstar and the Statesman Assistance Agreements provide that "[n]othing in this Agreement shall require any unlawful action or inaction by either party." The thrifts contend and the Claims Court found that the "unlawful action" clauses must be read to require compliance only with *then-existing* law, otherwise the government would be free to modify the Agreements by statute, counter to the provision of these Agreements requiring that modifications be executed in writing by the parties. *Statesman,* 26 Cl.Ct. at 914. This improperly mixes the sovereign and contracting functions of the government. FIRREA was not a modification of their contracts. It was a sovereign act of Congress that modified the regulatory environment in which the thrifts and OTS (the Bank Board's successor) would act. Furthermore, to limit these unqualified "unlawful action" clauses to then-existing laws and regulations would violate the rule of *POSSE* that waivers of sovereign authority must, at least, be explicit. The plaintiffs, the Bank Board and FSLIC all agreed to act in accordance with the law. They did not limit this obligation to those laws in effect at that time or laws that made their contract less burdensome or more profitable.

In addition, the "Accounting Principles" clauses in the Assistance Agreements of Statesman and Glendale, while not specifically addressing the issue here, show a recognition by the contracting parties that "the governing regulations and the accounting principles" would be subject to clarification, interpretation, or *amendment* by the Bank Board or its successor (here, OTS).[13] There is no restriction on what regulations were subject to amendment. In any event, the regulations here involved are essentially irrelevant to this case. The plaintiffs' quarrel is with the

---

12. For example, the Bank Board's *Statement of Financial Accounting Standards No. 72* provided that goodwill be amortized over a period *no greater than* the estimated remaining life of the long-term, interest-bearing assets.

13. As an example, the "Accounting Clause" in the Assistance Agreement of Statesman reads: [A]ny computations made for the purposes of this Agreement shall be governed by generally accepted accounting principles as applied on a going concern basis in the savings and loan industry, except that where such principles conflict with the terms of this Agreement, applicable regulations of the Bank Board or [FSLIC], or any resolution or action of the Bank Board approving or adopted concurrently with this Agreement, then this Agreement, such regulations, or such resolution or action shall govern. In the case of any ambiguity in the interpretation or construction of any provision of this Agreement, such ambiguity shall be resolved in a manner consistent with such regulations and the Bank Board's resolution or action. If there is a conflict between such regulations and the Bank Board's resolution or action, the Bank Board's resolution or action shall govern. For the purposes of this section, the governing regulations and the accounting principles shall be those in effect on the Effective Date *or as subsequently clarified, interpreted, or amended by the Bank Board or the Financial Accounting Standards Board* ("FASB"), respectively, or any successor organization. [Emphasis added.]

new statute, FIRREA, which did away with accounting gimmicks and extended amortization periods. The regulations merely conform to the statute.**

Recognizing the difficult, if not insurmountable, burden of showing that their contracts obligated the Bank Board to adhere to the regulations in effect at the time of the mergers notwithstanding subsequent acts of Congress, the plaintiffs argue that, while the capital requirements could be changed by Congress, their contract claims remain viable. Per the plaintiffs, it is irrelevant that their contracts do not restrict the Bank Board's duty to regulate in accordance with subsequent acts of Congress since they seek money damages for breach not specific performance.

■■■ This distinction in remedies, though significant to the law of takings, is not relevant to the plaintiffs' claims for breach of contract. A breach requires a binding promise. 11 Samuel Williston, *A Treatise on the Law of Contracts* § 1290 (3d ed. 1968). Specific performance and damages are merely alternative remedies for breach, for which damages is the primary remedy. *Id.* at § 1338. Where no contractual duty exists, no breach of contract is possible and no judgment for damages can be obtained. 5 Arthur Linton Corbin, *Corbin on Contracts* § 993 (1964). Because these contracts did not obligate the Bank Board (or OTS) to regulate in a manner inconsistent with FIRREA, the change in treatment of goodwill does not violate a contractual duty and cannot support a claim for damages for breach.

## IV.

The appellants and amici [14] raise numerous overlapping and intertwining arguments, all of which have been considered although not specifically discussed. Several merit at least comment. The "illusory" contract argument is one. The Claims Court concluded that construing these contracts to permit the Bank Board (or OTS) to regulate as subsequently mandated by FIRREA would render the contracts "illusory" because the Bank Board "would in effect be agreeing to abide by its promises only so long as it unilaterally decided to keep those promises." *Statesman*, 26 Cl.Ct. at 914–15. The court suggested that a contract which permits the "government" to perform at its "unrestricted pleasure" is really not a contract at all. *Id.* (quoting 17 C.J.S. *Contracts* § 98 (1963)).

■■■ As previously indicated, these contracts are no more "illusory" than a contract between private parties whose profitability is affected or determined by subsequent legislative action. A promisee whose contract was rendered unprofitable by FIRREA cannot hold his promisor accountable, unless the contract assigned the burden of such legislation to the latter. *See* note 10, *supra*. Contractors that desire to immunize their bargains from the vagaries and uncertainties of future legislation have developed a variety of devices for doing so. A *force majeure* clause is one such device. *Northern Ind.*, 799 F.2d at 274–75. Price floors and price ceilings are another. *Id.* at 278. Indemnity provisions are yet another. Similarly, a contractor may expressly fix its performance to correspond to then-existing regulations. *Hills Materials Co. v. Rice*, 982 F.2d 514 (Fed.Cir.1992). But a contract that lacks any of these (or similar) devices and thus leaves a private party vulnerable to changes in the law that render its performance unprofitable is not "illusory." It is merely unprofitable.

For the reasons discussed in section II *supra*, contracts between a private party and

---

By lifting the third sentence out of context, the dissent finds an express agreement that the negotiated forbearance and accounting procedures were guaranteed to continue despite a change in the law. It is not surprising that no party makes the argument that the right asserted by Statesman and Glendale to use purchase method accounting and extended amortization time periods involve an "ambiguity ... in this [Assistance] Agreement." It does not. Moreover, the change was the enactment of a new statute not a mere administrative change in a regulation.

** Editor's Note: Amended on Rehearing, see p. 819.

14. The Chamber of Commerce of the United States, The Aerospace Industries Association of America, The Electronic Industries Association, The Shipbuilders Council of America, Inc., Litton Industries, Inc., Amwest Savings Association, The Adam Corporation/Group, The Globe Savings Bank (FSB), Phoenix Capital Group, Inc., Old Stone Bank (FSB), Old Stone Corporation, Franklin Federal Bancorp, The Long Island Savings Bank (FSB), The Long Island Savings Bank of Centereach (FSB), Keystone Holdings, Inc., and American Savings Bank (FA).

a contracting agent of the government are no different. We have concluded that under the *POSSE* rule of construction, the Bank Board, in all of these contracts, did not bind the "government" generally or itself particularly to regulate plaintiffs only in accordance with past legislation. Merely by signing these contracts, the Bank Board did not assume responsibility for the effects of subsequent legislation. The plaintiffs could have obtained an enforceable promise shifting the risk to the government. But they did not do so. *See, e.g., Amino Bros. Co. v. United States,* 178 Ct.Cl. 515, 372 F.2d 485, 491, *cert. denied,* 389 U.S. 846, 88 S.Ct. 98, 19 L.Ed.2d 112 (1967) ("The Government cannot make a binding contract that it will not exercise a sovereign power, but it can agree in a contract that if it does so, it will pay the other contracting party the amount by which its costs are increased by the sovereign act."); *Piggly Wiggly Corp. v. United States,* 112 Ct.Cl. 391, 81 F.Supp. 819, 823 (1949) (sovereign acts may harm party that has contracted with government unless contracting party protected against price in the event of the act). Although others appear to have dealt with the risks of future changes in the law in their contracts, plaintiffs here did not. Brief for Amici Curiae Keystone Holdings, Inc. and American Savings Bank, F.A. at 12. There is no *force majeure* clause in any of the plaintiffs' contracts. There is no clause that limits the plaintiffs' future capital contribution (for purposes of meeting regulatory capital standards) to a fixed sum. There is simply no clause that obligates FSLIC to indemnify any of the plaintiffs against future regulatory changes in the capital standards.[15] Because nothing in these contracts shifts that risk to the Bank Board, that risk must be borne by the plaintiffs.

## V.

We conclude that the plaintiffs had no contract right to have the goodwill generated by their acquisition(s) treated as regulatory capital. All of the subject contracts left the Bank Board (and OTS) free to regulate in accordance with subsequent acts of Congress, specifically FIRREA. Thus, there was no contractual promise by the government which could be breached. Because none of the contracts assigned to FSLIC or the Bank Board the risk of any subsequent change in capital standards by Congress, the plaintiffs bear that burden here. We, therefore, reverse the Claims Court's judgment of liability in each of these consolidated cases.

Our disposition of these appeals does not dispose of all claims for recovery asserted by the plaintiffs. In particular, plaintiffs have asserted constitutional claims for just compensation for the taking of their property. To the extent a plaintiff's other claims are not premised upon the taking of a *contract right* to continue to use goodwill as regulatory capital, such claims remain for decision. Accordingly, their cases are remanded for further proceedings consistent herewith.

## VI.

Each party will bear its own costs.

REVERSED AND REMANDED.

PAULINE NEWMAN, Circuit Judge, dissenting.

There has been a good deal of litigation engendered by the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), including litigation arising out of arrangements similar to those of the three cases here consolidated, wherein solvent banks and other investors were encouraged by the government to enter into merger arrangements for the purpose of salvaging failing or failed thrift institutions. Such salvage operations included the infusion of substantial sums of private as well as governmental money. The solvent banks contributed their resources on the promise by the government that the capital requirements of the merged banks could be met, *inter alia,* by capitalization of "supervisory goodwill" and the long-term amortization of the capital account. These promises were memorialized in lengthy contracts that set forth the details and integrated the arrangements, including the implementing forbearance letters and

---

**15.** In the Winstar Assistance Agreements and in the Glendale Supervisory Action Agreement, the government did promise to indemnify the thrifts against undisclosed liabilities and litigation challenging the merger. The Glendale contract also states which party would bear the risk of change in interest rates. These indemnification obligations are not involved here.

Bank Board resolutions. These documents were explicit as to the financial and other obligations of all parties, the conditions and mutual promises by which these commitments involving many millions of dollars were made. It is not disputed that these arrangements would not have been entered into but for the conditions that were agreed to by the government, after extensive negotiation. These conditions, which enabled these arrangements, were made illegal by FIRREA or by the regulations implementing FIRREA.

In the three cases at bar the merger agreements were made in 1981, 1984, and 1988. After enactment of FIRREA in 1989 the government required these merged thrift institutions to conform with the new accounting standards and capital requirements. In two of the three cases these changed requirements immediately placed the merged banks into non-compliance, and these institutions were promptly placed in receivership.

The panel majority, in a lengthy analysis, determines that these banks are not entitled to specific performance of their preexisting arrangements. That question, although stressed in the government's briefs, is not at issue in this case. That question was extensively litigated in the regional district and circuit courts, in connection with various other banks' requests for relief in the form of specific performance of the particular arrangements between such banks and the relevant government agency. However, that remedy is not within the Court of Federal Claims' Tucker Act authority, and the issue of specific performance is not before the Federal Circuit. Nor are any contracts other than those of these three sets of plaintiffs.

Although litigation has been extensive, the regional circuits did not reach the question of the financial consequences of the enactment of FIRREA and of the resultant impossibility of performance of the various arrangements. The regional circuits uniformly held that these questions of money damages are excluded from their purview. The issues and remedies of financial recompense are decided for the first time in these suits in the Court of Federal Claims.

In these three appeals the plaintiff banks do not dispute that Congress has the power to enact FIRREA and to foreclose continued performance of these contracts. The issue, as the Court of Federal Claims made clear, is whether the government is liable for the financial consequences of these acts, not whether the government had the authority to act.

The panel majority, rejecting the reasoning and conclusions of the Court of Federal Claims, holds that there is no governmental liability because there were no contracts between the government and these thrift institutions. The panel majority also holds that if there were contracts, the entire risk of impossibility of performance must be borne by the nongovernmental party. The rationale for this latter ruling appears to be that the government may abrogate contracts without liability, under the "sovereign acts doctrine".

Since there are indeed contracts as to all three of these thrift groups, and immunity under the sovereign acts doctrine is not warranted in these cases, the Court of Federal Claims correctly decided that the government is liable for the financial consequences of its acts. Indeed, governmental responsibility is not a new idea in this nation's law, and the reasoning of the Court of Federal Claims is solidly supported in contract law and in the application of the sovereign acts doctrine to this case.

A

The sovereign acts doctrine appeared in Court of Claims jurisprudence early in that court's existence, in *Deming v. United States*, 1 Ct.Cl. 190, 1865 WL 2004 (1865). It relates to acts of government in exercise of the responsibility to make and administer laws for the general welfare. As a "doctrine" it is an apothegm for the principle that there is a distinction between governmental acts for general and public benefit, and acts of government when dealing with specific persons and businesses. When the government acts as a contractor with a specific private entity, this doctrine provides no immunity:

The United States are as much bound by their contracts as are individuals. If they repudiate their obligations, it is as much repudiation, with all the wrong and reproach that term implies, as it would be if the repudiator had been a State or a municipality or a citizen.

*Sinking–Fund Cases,* 99 U.S. (9 Otto) 700, 719, 25 L.Ed. 496 and 504 (1879). However, when the government acts as legislator/regulator in furtherance of the general welfare, an incidental and unintended impact on specific preexisting contracts to which the government is a party does not thereby increase the responsibility or liability of the government as contractor. As the Supreme Court explained, public and general acts of government that are not directed to particular contracts do not impose liability upon the government beyond that which it has as a party to the contract:

> It has long been held by the Court of Claims that the United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign.... "The two characters which the government possesses as a contractor and as a sovereign cannot be thus fused; nor can the United States while sued in the one character be made liable in damages for their acts done in the other. Whatever acts the government may do, be they legislative or executive, so long as they be public and general, cannot be deemed specially to alter, modify, obstruct or violate the particular contracts into which it has entered with private persons."

*Horowitz v. United States,* 267 U.S. 458, 461, 45 S.Ct. 344, 344–45, 69 L.Ed. 736 (1925) (quoting *Jones v. United States,* 1 Ct.Cl. 383, 384–85, 1865 WL 1976 (1865)). Illustrations are seen, *e.g.,* in *Amino Bros. Co. v. United States,* 178 Ct.Cl. 515, 372 F.2d 485, 491, *cert. denied,* 389 U.S. 846, 88 S.Ct. 98, 19 L.Ed.2d 112 (1967) (action by the Army Corps of Engineers in flood control on the Smoky Hill River held a sovereign act for public benefit; there was no express or implied promise to contractor working downriver that the flood control power would not be exercised); *Piggly Wiggly Corp. v. United States,* 112 Ct.Cl. 391, 419–433, 81 F.Supp. 819, 823 (1949) (price control and allocation of plywood by the Office of Price Administration was a sovereign act; it was proper for Quartermaster Corps of War Department to terminate contract for convenience with appropriate recompense to contractor.)

It is quite clear that the sovereign acts doctrine does not mean that the government can walk away from any contract to which it is a party, avoiding all contractual liability, whenever there is intervening legislative or regulatory action. The sovereign acts doctrine "is not a boundless justification for governmental non-liability." Peter S. Latham, *The Sovereign Act Doctrine in the Law of Government Contracts: A Critique and Analysis,* 7 U.Tol.L.Rev. 29, 41 (1975). In *Perry v. United States,* 294 U.S. 330, 55 S.Ct. 432, 79 L.Ed. 912 (1935) the Supreme Court considered the application of the sovereign acts doctrine to a congressional resolution that declared that payment in gold was "against public policy" and that all past and future governmental obligations would be paid with then legal tender. The Court held that persons holding Treasury bonds that provided for payment in gold coin had a binding and enforceable contract, and that:

> Congress can [not] disregard the obligations of the Government at its discretion.... We do not so read the Constitution.

*Perry,* 294 U.S. at 350, 55 S.Ct. at 434. In *Freedman v. United States,* 162 Ct.Cl. 390, 320 F.2d 359 (1963) the Court of Claims explained that the sovereign acts doctrine

> does not relieve the government from liability where it has specifically undertaken to perform the very act from which it later seeks to be excused.

*Id.* at 402, 320 F.2d 359. According to these precepts, acts of government that directly abrogate existing contractual obligations, even if undertaken for reasons of general welfare, are not immune from liability. *E.g., Everett Plywood Corp. v. United States,* 227 Ct.Cl. 415, 651 F.2d 723, 731–32 (1981) (cancellation of timber contract due to government's concern for environment is not immune from liability as a sovereign act); *Sun Oil Co. v. United States,* 215 Ct.Cl. 716, 572 F.2d 786, 817 (1978) (government's denial of drilling permit and consequent breach of drilling lease due to government's environmental concerns is not immune as a sovereign act).

Applying precedent, the Court of Federal Claims held that the abrogation of the arrangements the government had entered into with these banks was not immune from liability as a sovereign act. As further discussed, no error in this analysis or conclusion has been shown.

## B

It can not be seriously disputed that in its arrangements with these banks the government acted as a contractor. These were commercial arrangements, entered into after extensive arms-length negotiations and upon mutual exchanges of consideration. They are embodied in lengthy documents, with all requisite governmental approvals, signed by authorized persons, and including the specific accounting and amortization terms that were essential conditions. Pertinent documents were integrated and cross-referenced, in textbook compliance with the rules of contract. There is no asserted ambiguity.[1] Indeed, it will come as a surprise to the many lawyers involved in these multi-million dollar transactions that they did not, after all, succeed in making a contract. The government's disavowal of having made binding contracts comes with poor grace, not only in view of the government's encouragement of these arrangements when they were made, but also because performance was accepted by the government for several years.

The Court of Federal Claims, considering the question of the relationship of these arrangements to the enactment and administration of FIRREA, found that the various banks that had merged with failed or failing thrifts, and the terms of the mergers whereby the existing capital requirements were met, were well known to the legislators. Recognition of these arrangements pervades the legislative record. *E.g.,* H.R.Rep. No. 54, 101st Cong., 1st Sess., pt. 1, at 498 (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 293–94 (additional views of Mr. Annunzio, Mr. Kanjorski and Mr. Flake):

> Simply put, [FIRREA] has reneged on the agreements that the government entered into concerning supervisory goodwill.... Clearly, the agreements concerning the treatment of goodwill were part of what the institutions had bargained for. Just as clearly, [FIRREA] is abrogating those agreements.

H.R.Rep. No. 54, 101st Cong., 1st Sess., pt. 5, at 27–28 (1989), *reprinted in* 1989 U.S.C.C.A.N. 397, 410–11 (additional views of Mr. Hyde):

> Overnight, as the accounting standards are re-legislated, [institutions with supervisory goodwill agreements] will become 'unsafe and unsound' for purposes of federal banking law.... [T]he current terms of [FIRREA] could end up punishing the very institutions that came to the aid of taxpayers in the early part of this decade.... I believe that many of these institutions have a case based in law, in equity, and in fundamental fairness.

135 Cong.Rec. H2706 (daily ed. June 15, 1989) (Statement of Rep. Crane):

> In the early 1980's a number of savings and loans were asked by our government to acquire ailing thrifts in order to help the government and the taxpayers avert paying billions of dollars in bailout funds.... How many institutions will trust the government after seeing Congress abrogate these deals?

135 Cong.Rec. H2783 (daily ed. June 15, 1989) (Statement of Rep. Ackerman):

> In its present form, [FIRREA] would abrogate written agreements made by the U.S. government to thrifts that acquired failing institutions by changing the rules in the middle of the game....

Criticisms such as the following reinforce the view that these contracts were targeted, and not an incidental side-effect of a general and public law. 135 Cong.Rec. H2705 (daily ed. June 15, 1989) (statement of Rep. Gonzalez):

> In blunt terms, the bank Board and FSLIC Insurance fund managers entered into bad deals—I might even call them steals.

Recognizing that it was abrogating these agreements, Congress sought advice on the consequences of enactment of FIRREA; the record shows that it received inconsistent advice. *Compare* Letter from the Comptroller General of the United States to the Senate Committee on Banking, Housing and Urban Affairs (August 27, 1990), advising that there could be liability for breach of contract and unconstitutional taking of property, *with* the statement of Rep. Gonzalez, at 135 Cong. Rec. H2705 (daily ed. June 15, 1989) that the Department of Justice advised that FIRREA would result in no contractual or constitutional claims. This record is pertinent today because it shows that Congress knew of these arrangements, and knew that their

---

1. The panel majority appears to misapprehend

my position, for there is no issue of ambiguity.

performance would be affected by the new requirements set by FIRREA. There is no error in the ruling of the Court of Federal Claims that the effect on these banks was a foreseen and intended consequence of the legislation and its regulatory implementation, thus negating immunity as a sovereign act.

It is an unwarranted criticism of the Court of Federal Claims to state that it improperly mixed the sovereign and contracting functions of government, for it is clear that the Court understood and correctly applied the distinction. The sovereign act doctrine does not mean that the legislative branch is somehow a different "government" than the executive branch, and that the United States is not liable for contract-affecting actions of the executive in administering legislation. To the contrary, the protection of persons who contract with the government through its agencies is essential to the nation's operations. The Court of Federal Claims correctly concluded that the government could not, without liability, abrogate the specific contracts that the government had made with thrift institutions. The court stressed that the issue under the Tucker Act is solely of financial liability.

The government, and the panel majority, rely heavily on *Bowen v. Public Agencies Opposed to Social Security Entrapment,* 477 U.S. 41, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986) (*"POSSE"*) wherein the Court held that Congress could remove the right of state government to withdraw from the Social Security system. However, *POSSE* did not hold that Congress could simply abrogate any contract right. In *POSSE* the Court held that there was no bargained-for consideration, and therefore no contract right to start with. 477 U.S. at 55–56, 106 S.Ct. at 2398. The Court stressed that the provision of Social Security benefits to state employees was a gratuitous benefit bestowed upon the states by Congress. Although the government here presses a far broader interpretation, *POSSE* does not hold that Congress may without liability abrogate contracts between the United States and others except for situations where the government made an "unmistakable" promise not to do so.

The Court of Federal Claims did not make the mistake of confusing the government's right to legislate in the public interest with the government's obligations in specific contractual commitments. This distinction is a necessary implementation of the principles by which our government does business with its citizens. These principles are fundamental to our history. In *Murray v. Charleston,* 96 U.S. (6 Otto) 432, 24 L.Ed. 760 (1878) the Court rejected the theory, offered then as it is now, that a contractual promise can be abrogated through the exercise of inherent sovereign authority. In *Perry v. United States,* discussed *supra,* the Court quoted Alexander Hamilton as follows:

> [W]hen a government enters into a contract with an individual, it deposes, as to the matter of the contract, its constitutional authority, and exchanges the character of legislator for that of a moral agent, with the same rights and obligations as an individual. Its promises may be justly considered as excepted out of its power to legislate unless in aid of them. It is in theory impossible to reconcile the idea of a promise which obliges, with the power to make a law which can vary the effect of it.

294 U.S. at 351 n. 2, 55 S.Ct. at 435 n. 2 (citing 3 Hamilton's Works, 518, 519). As the Court in *Perry* reaffirmed, although the government can not agree not to exercise its sovereign power in the future, "the right to make binding obligations is a competence attaching to sovereignty." 294 U.S. at 353, 55 S.Ct. at 436.

### C

The contracts here at issue were entered into after extensive negotiation, with concessions and commitments by both sides. The contracts in the three suits differ in their terms, for each is specific to the circumstances of the acquired and acquiring banks.

The Court of Federal Claims correctly held that these elaborate, lengthy, detailed contemporaneous documents, including documents incorporated by reference, are contracts. Both the government and the banks so treated them during the years of performance in accordance with their terms. Both the government and the banks transferred many millions of dollars on the basis of these arrangements. On the "mere signing", as the panel majority puts it, Winstar and United Federal together contributed two million dollars and assumed additional millions in liabilities; Statesman Savings and American Life and Casualty together contributed twenty-one million dollars and assumed additional

millions in liabilities; and Glendale Federal assumed $734 million in liabilities. All of these commitments were conditioned on the specific accounting procedures and amortization requirements that were negotiated and agreed to in order to enable these thrifts to survive while new funds and new management sought to resuscitate them. Further, the government does not dispute that it has retained the funds contributed by the private banks.

I will not repeat the careful analysis by the Court of Federal Claims of these three sets of documents. I take note of the panel majority's apparent belief that documents incorporated by reference, or conditions subsequent, or integration clauses, do not a contract make. Indeed, it is curious to see the panel majority treat as meaningless the negotiated amortization periods on the reasoning that these periods "complied with the Bank Board's then-existing regulations." These amortization terms were essential to the viability of each bank's investment. That they were not illegal when adopted is not surprising. To hold that their legality when adopted means that they "do not commit the Bank Board", despite their explicit incorporation in contract documents with and by the Bank Board, is a strange view of contract law.

The government argues that the banks simply gambled that the law governing these mergers would not change, and thus are not entitled to redress when the law did change. The contracts show that the parties indeed recognized this possibility, and provided for it in various ways. Thus the "Accounting Principles" clauses in the Winstar and the Statesman agreements reflect the parties' recognition that the accounting principles might in the future be "subject to clarification, interpretation or amendment", and provide that "[i]f there is a conflict between such regulations and the Bank Board's resolution or action [adopted concurrently with this agreement], the resolution or action shall govern."[2]

The government thus expressly agreed that in the event of regulatory change, the negotiated forbearances and accounting procedures would govern. This is surely not an assumption of risk by the contractor, an acceptance of the "vagaries and uncertainties of future legislation", quoting the panel majority. It is a negotiated contract provision that removed this foreseen risk by dealing specifically with an aspect that was critical to the viability of the venture.

### D

These contract terms, and the bargained-for consideration on both sides, illuminate a basic flaw in the panel majority's reasoning with respect to the sovereign acts doctrine. For if the enactment of FIRREA is viewed as a sovereign act for the general welfare, unencumbered by specific contractual arrangements, then the relationship between the government as contractor, on the one hand, and these banks on the other hand, would be the same as for any other set of contracting parties. In such case, when the contract is no longer capable of performance on its agreed terms, (whether because of legislative or agency action or Act of God) the laws of contract do not automatically place the burden of accommodation on one side only. See Restatement (Second) of Contracts § 272 (discussing forms of available relief such as rescission when contract performance has become impracticable), § 264 (governmental regulation can render performance impracticable and be subject to relief), and § 377 (remedy of restitution in cases of impracticability and frustration of contractual purpose). The government is not simply excused from further obligations without liability. Thus even if the enactment of FIRREA were treated as a sovereign act it would be incorrect to place on these banks the entire burden of impossibility of performance of their contracts, as has here been done.

However, if the enactment or administration of FIRREA is not viewed as a sovereign act with respect to these contracts, in that it was known and expected that this law would interfere with or make impossible the continued performance of specific contracts by changing the rules of capital compliance, then

---

**2.** Although the panel majority states that this language is "lifted" out of context, the context in the Accounting Clause reinforces the intent that the contract terms shall prevail in case of future conflict. This clause states a straightforward commercial understanding of what the parties intended should a foreseeable event occur. This is simply good contract draftsmanship, for it was fundamental that it was the accounting principles that made the arrangements viable.

the government has made performance of its own contracts impossible: not by *force majeure*, as the majority suggests, but by governmental act. That the government may be empowered to legislate in this way, and that a desired public policy is served, does not mean that it can be done without liability to those with whom the government had made a different commitment. The government is not exonerated of responsibility with respect to specific commercial contracts to which it is a party, whether the breach is by executive or legislative action.

Thus, on any application of the sovereign acts doctrine, these plaintiffs have a remedy for breach of contract. I would affirm the decisions of the Court of Federal Claims in these three cases.

### ORDER

#### Aug. 18, 1993.

The appellees, Glendale Federal Bank, FSB, and Statesman Savings Holding Corp., The Statesman Group, Inc., and American Life and Casualty Insurance Co., filed separate petitions for rehearing and suggestions for rehearing in banc. Upon consideration by the panel of the petitions for rehearing and of the responses filed by the appellant at the request of the panel, and the supplemental submissions, it is:

ORDERED that the petitions for rehearing are GRANTED, but only to make the following changes in the text of the opinion:

Page 20:

lines 16–17: Delete "agreed to" and insert therefor—understood respecting how goodwill would be treated—

line 17: Delete "further"

Page 32:

lines 2–3: Delete "quarrel is with" and insert—arguments focus on—

line 4: After "periods" insert—not on the regulations—

lines 4–5: Delete "the regulations merely ... statute."

Judge Newman's comments on the changes are attached hereto.

Upon consideration of the suggestions for rehearing in banc thereafter by the circuit judges who are in regular active service, the suggestions are ACCEPTED.

It is FURTHER ORDERED that the judgment of the court entered on May 25, 1993, is vacated and that the opinion of the court, as amended, accompanying the said judgment is withdrawn.

The parties will be advised in due course if additional briefing is needed and of the date of hearing in banc.

NEWMAN, *Circuit Judge*, commenting on the Order amending the text of the majority opinion.

The reasons for the panel majority's changes are not stated. Thus I write separately to point out that:

(1) These cases do not turn on whether the written arrangements between these banks and the government are designated as "understandings" instead of "agreements". Such semantics do not control the fundamental issues raised.

(2) The now-deleted sentence that "The regulations merely conform to the statute" was indeed incorrect. However, the further statement that the regulations were not placed at issue is also incorrect, for this litigation unambiguously relates to the statute as implemented by the regulations.