# Appropriate Source for Payment of Judgments and Settlements in *United States v. Winstar Corp.*

The Federal Savings and Loan Insurance Corporation Resolution Fund is the appropriate source of payment for judgments against, and settlements by, the United States in *United States v Winstar Corp* and similar cases arising from the breach of certain agreements to which the Federal Savings and Loan Insurance Corporation was a party

July 22, 1998

MEMORANDUM OPINION FOR THE DEPUTY GENERAL COUNSEL
DEPARTMENT OF THE TREASURY

On July 1, 1996, the Supreme Court decided *United States v. Winstar Corp.*, 518 U.S. 839 (1996). The Court held that the United States was liable in three cases for breaching contracts into which it had entered with entities that took over failing thrifts during the savings and loan crisis of the 1980's. Because the United States Court of Federal Claims ("CFC") had not yet determined the appropriate measure or amount of damages, the Supreme Court remanded for further proceedings. *Id.* at 910. After the *Winstar* decision was handed down, a large number of cases premised on identical or similar theories of relief that had been stayed pending the Supreme Court's decision were activated.[1] We understand that in virtually all of these cases, which are currently pending before the CFC or the United States Court of Appeals for the Federal Circuit, the government contests liability and/or disagrees with the plaintiffs regarding the appropriate measure or amount of damages.

You have asked for our views regarding the appropriate source for payment of judgments in the *Winstar*-related cases.[2] Because the government is currently considering the possibility of settling two of the three cases that the Supreme Court considered in *Winstar*, as well as certain other *Winstar*-related cases, you have also asked for our opinion regarding the appropriate source of funds for the payment of such settlements. The appropriate source of funds for a settled case is identical to the appropriate source of funds should a judgment in that case be entered against the government. *See Availability of Judgment Fund in Cases Not Involving a Money Judgment Claim*, 13 Op. O.L.C. 98, 103 (1989) ("[I]n determining whether a proposed settlement is payable from the Judgment Fund, the Attorney General or his designee should examine the underlying cause of action, and decide whether the rendering of a final judgment against the United States under such a cause would have required a payment from the Judgment

---

[1] For ease of discussion, we refer to both these cases and the cases decided by the Supreme Court in *Winstar* collectively as "*Winstar*-related cases"

[2] Although we provided the Federal Deposit Insurance Corporation the opportunity to provide its views on this matter, it declined to do so

Fund."); 3 Office of the General Counsel, United States General Accounting Office, Principles of Federal Appropriations Law 14–9 (2d ed. 1994) ("GAO Principles") (stating that compromise settlements have no effect on the source of funds).[3]

Our discussion of the appropriate source of funds necessarily is premised on courts finding the government liable or on the government entering into settlements based on the risk that a court would find the government liable. We do not, however, mean to suggest that we have reached any conclusions regarding the likelihood of such potential findings. We discuss cases in the context of a finding of government liability because it is only in those cases, and in settlements entered into due to the risk of such a finding, that the appropriate source of funds for the payment of judgments by the government is an issue.

We understand from the Commercial Litigation Branch of the Civil Division of the Department of Justice that, to the extent that the government has settled or is engaged in settlement negotiations in any of the *Winstar*-related cases, these cases involve "Assistance Agreements" or "Supervisory Action Agreements" to which the Federal Savings and Loan Insurance Corporation ("FSLIC") was a party. We have therefore limited our analysis of the appropriate source of payment for settlements or potential judgments to the *Winstar*-related cases in which FSLIC was a party to the underlying Assistance Agreements and Supervisory Action Agreements.[4]

Based upon the information currently available to us, we believe that the FSLIC Resolution Fund is the appropriate source of funds to pay judgments and settlements in *Winstar*-related cases in which FSLIC was a party to an Assistance Agreement or Supervisory Action Agreement.[5] Congress created the FSLIC Resolution Fund to assume, with a single statutory exception that is not relevant here, 12 U.S.C. § 1441a (1994), "all assets and liabilities of the FSLIC on the day before" FSLIC was abolished. 12 U.S.C. § 1821a(a)(2) (1994). Although the term "liabilities" is not defined in the statute, its ordinary meaning includes contingent liabilities, such as certain contractual obligations, and there is no reason to believe that Congress departed from this ordinary meaning when it created the FSLIC

---

[3] Although the opinions and legal interpretations of the General Accounting Office and the Comptroller General often provide helpful guidance on appropriations matters and related issues, they are not binding upon departments, agencies, or officers of the executive branch. *See Bowsher v. Synar*, 478 U.S. 714, 727–32 (1986).

[4] It is our understanding that whether an agreement qualifies as an "Assistance Agreement" or a "Supervisory Action Agreement" depends only on the labeling of the agreement, the terms were used interchangeably, although the term "Assistance Agreement" was more common. Telephone conversation between Caroline Krass, Attorney-Adviser, Office of Legal Counsel and Aaron Kahn, Principal Litigation Counsel, Office of the General Counsel, Office of Thrift Supervision, Department of the Treasury (June 30, 1998)

[5] In March 1996, prior to the Supreme Court's decision in *Winstar*, this Office opined that the FSLIC Resolution Fund was the proper source for payment of the judgment in *RTC v. FSLIC*, 25 F.3d 1493 (10th Cir. 1994) ("*Security Federal*"). *See* Letter for Ricki Helfer, Chairman, FDIC, from Walter Dellinger, Assistant Attorney General, Office of Legal Counsel, *Re: Reimbursement from the Federal Judgment Fund for Payment of Judgment in RTC v. FSLIC, (10th Cir 1994)* (Mar. 18, 1996) ("Helfer Letter"). Our opinion expressly stated, however, that it was limited to the facts of *Security Federal. See id.* at 2 ("We have not attempted to determine and make no suggestion here as to the proper source of payment for any judgment that might be entered in the other goodwill/capital forbearance cases ").

Resolution Fund. Based on the Supreme Court's theory of liability in *Winstar*, we believe that the judgments or settlements in the *Winstar*-related cases in which FSLIC was a party to the underlying Assistance Agreements and Supervisory Action Agreements would qualify as "liabilities" of FSLIC under § 1821a(a)(2). Accordingly, in these cases, the potential judgments, and the settlements entered into to avoid the risk of such judgments, are payable from the FSLIC Resolution Fund. Because payment is "otherwise provided for" within the meaning of the . Judgment Fund statute, the Judgment Fund is not available to pay such judgments and settlements. *See* 31 U.S.C. § 1304 (1994).

## I. BACKGROUND

During the Great Depression, over 1,700 savings and loans, or "thrifts," failed because borrowers could not pay their mortgages. *See* H.R. Rep. No. 101–54, pt. 1, at 292 (1989), *reprinted in* 1989 U.S.C.C.A.N. 86, 88 ("House Report"). As a result, thrift depositors lost approximately $200 million. In response, Congress took three actions to stabilize the thrift industry. First, in 1932, Congress created the Federal Home Loan Bank Board ("Bank Board") to channel funds to thrifts to finance home mortgages and to prevent foreclosures. *See* Pub. L. No. 72–304, ch. 522, 47 Stat. 725 (1932) (codified as amended at 12 U.S.C.A. §§ 1421–1449 (West 1989 & Supp. 1998)). Second, Congress passed the Home Owners' Loan Act of 1933, which authorized the Bank Board to charter and to regulate federal thrifts. *See* Pub. L. No. 73–43, ch. 64, 48 Stat. 128, 132–34 (1933) (codified as amended at 12 U.S.C. §§ 1461–1468c (1994 & Supp. II 1996)). Finally, in 1934, Congress created the Federal Savings and Loan Insurance Corporation, "under the direction of" the Bank Board, to insure thrift deposit accounts and to regulate all federally insured thrifts to ensure that their capital is unimpaired and that their financial policies and management are "safe." *See* Pub. L. No. 73–479, ch. 847, 48 Stat. 1246, 1256–61 (1934) (codified as amended at 12 U.S.C.A. §§ 1701–1750g (West. 1989 & Supp. 1998)); 12 U.S.C. § 1726(c) (1988) (repealed 1989).

### A. The Savings and Loan Crisis of the Early 1980's

The savings and loan crisis of the early 1980's originated from the rising interest rates of the late 1970's and early 1980's. Many thrifts were locked into long-term, low-yield, fixed-rate mortgages created when interest rates were low, and thus the high interest rates caused the thrifts to experience large operating losses as they raised savings account interest rates in an effort to attract funds from depositors. *See Winstar*, 518 U.S. at 845 (plurality opinion); House Report at 291, *reprinted in* 1989 U.S.C.C.A.N. at 87. By 1981, thrifts' mortgage portfolios were yielding ten percent, but the thrifts were paying an average of eleven percent

for their funds, and between 1981 and 1983, 435 thrifts failed. *See* House Report at 296, *reprinted in* 1989 U.S.C.C.A.N. at 92. As the federal insurer of the thrift deposits, FSLIC was responsible for liquidating the failed thrifts, if necessary, and reimbursing depositors for the insured funds they had lost. FSLIC, however, lacked adequate assets to do so. In 1985, for example, FSLIC had $4.55 billion in its insurance fund, but the Bank Board estimated that it would cost $15.8 billion to liquidate all the thrifts deemed insolvent under generally accepted accounting principles ("GAAP"). *See Winstar*, 518 U.S. at 847 (plurality opinion).

In response to the crisis, Congress and the executive branch extensively deregulated the thrift industry to enable thrifts to compete with other financial services providers for funds and to broaden their investment powers. *See id.* at 845 (plurality opinion); House Report at 291, *reprinted in* 1989 U.S.C.C.A.N. at 87. In addition, the Bank Board lowered the capital requirement for thrifts from five percent to four percent of assets in 1980, and from four to three percent in 1982. *See Winstar*, 518 U.S. at 845–46 (plurality opinion). The capital requirement has been described as " 'the most powerful source of discipline for financial institutions.' " *Id.* at 845 (quoting Breeden, *Thumbs on the Scale: The Role that Accounting Practices Played in the Savings and Loan Crisis*, 59 Fordham L. Rev. S71, S75 (1991)). To give more leeway to the struggling thrifts, the Bank Board also promulgated new "regulatory accounting principles" that often replaced GAAP in determining whether thrifts could meet the Bank Board's capital requirement. "The reductions in required capital reserves," the plurality explained in *Winstar*, "allowed thrifts to grow explosively without increasing their capital base, at the same time deregulation let them expand into new (and often riskier) fields of investment." *Id.* at 846.

Based upon the facts before it, the plurality observed that, "[r]ealizing that FSLIC lacked the funds to liquidate all of the failing thrifts, the Bank Board chose to avoid the insurance liability by encouraging healthy thrifts and outside investors to take over ailing institutions in a series of 'supervisory mergers.' " *Id.* at 847. The plurality explained:

> Such transactions, in which the acquiring parties assumed the obligations of thrifts with liabilities that far outstripped their assets, were not intrinsically attractive to healthy institutions; nor did FSLIC have sufficient cash to promote such acquisitions through direct subsidies alone, although cash contributions from FSLIC were often part of a transaction. Instead, the principal inducement for these supervisory mergers was an understanding that the acquisitions would be subject to a particular accounting treatment that would help the acquiring institutions meet their reserve capital requirements imposed by federal regulations.

*Id.* at 848 (citations omitted).

According to the plurality in *Winstar*, the Bank Board and FSLIC[6] granted acquiring entities three different types of beneficial accounting treatment, often referred to as "forbearances," in connection with supervisory mergers. *Id.* at 848–56. First, the Bank Board and FSLIC "let the acquiring institutions count supervisory goodwill toward their reserve requirements." *Id.* at 850 (plurality opinion). Under the "purchase method" of accounting, "goodwill," i.e., the amount by which the purchase price of an acquired entity exceeds the fair value of all identifiable assets, could be counted as an intangible asset. *Id.* at 848–49 (plurality opinion). The plurality noted that, in the typical situation, the counting of goodwill as an intangible asset makes sense because a rational purchaser in a free market would not purchase a business for more than the fair value of the business's assets unless there were some "going concern" value that made up the difference. *Id.* at 849. In the supervisory mergers, however, this situation was not the case. Instead, "[b]ecause FSLIC had insufficient funds to make up the difference between a failed thrift's liabilities and assets, the Bank Board had to offer a 'cash substitute' to induce a healthy thrift to assume a failed thrift's obligations." *Id.* at 849–50 (plurality opinion). According to the plurality, that "cash substitute" permitted the healthy thrift to count the amount by which the liabilities of a failing thrift exceeded the fair value of its assets as an intangible asset, and was referred to as "supervisory goodwill." *Id.* Counting supervisory goodwill as an intangible asset that could be used to meet capital requirements was attractive to the acquiring entities because it prevented the negative net worth of the failing thrifts from being deducted from the acquiring entities' capital, thereby allowing them to avoid insolvency under federal requirements. *Id.* at 850 (plurality opinion).

Second, thrifts were permitted to take extended periods of time, up to forty years, to "depreciate" or amortize the value of supervisory goodwill, a questionable asset. The essence of supervisory goodwill was that it created a paper asset in a supervisory merger that was necessary because the liabilities of the institution being acquired exceeded the fair value of its assets. When the acquiring entity was permitted to extend the time to write down that paper asset, it understated for each reporting period the resulting amortization expense and reduction in its recorded assets and deferred a possible failure to meet capital requirements. *See id.* at 851 (plurality opinion).

In addition, thrifts were permitted to accelerate the recognition of capital gains to be realized on depreciated assets, when those benefits in fact arose over longer periods. The "gains" arose from the accretion of discounts on loans in portfolio. A thrift cannot sell at face value a loan bearing interest at a below-market interest rate. Instead, it accepts a discount from face value that would increase the effective rate on that asset to a market rate. As these loans approach maturity, the discount

---

[6] We refer to "the Bank Board and FSLIC" together for ease of discussion in this section of the memorandum, although both entities may not have been involved in all cases

145

decreases to zero. The acquiring entity would record the accretion of discount on its income statement as a gain, in the same fashion as it would for a bond in portfolio that it holds to maturity. The faster the thrift recognized the gains, the more income it could report in the short term. *See id.*

The amount of discount in a troubled thrift would generally approximate the amount of goodwill created by the supervisory merger. Ideally, a thrift should have written down its goodwill at the same rate it recognized gains from accretions of discount. The combination of the questionable practices of accelerating the rate of gain recognition and deferring the amortization of supervisory goodwill provided a method for unhealthy institutions to attempt to survive by engaging in supervisory mergers. According to the plurality in *Winstar*, "[t]he difference between amortization and accretion schedules thus allowed acquiring thrifts to seem more profitable than they in fact were." *Id.* at 853.

Third, the Bank Board and FSLIC generally permitted double-counting of cash contributions by FSLIC to supervisory mergers. While the acquiring entity was permitted to treat FSLIC's cash contribution as a credit for its capital requirement, described as a "capital credit," it was not required to subtract the amount of the contribution from the amount of supervisory goodwill. *Id.* Thus, the amount was, in effect, counted twice, once as a tangible asset—cash—and once as an intangible asset—supervisory goodwill. *Id.*

## B. The Legislative Response: FIRREA

The regulatory measures taken in the 1980's by the Bank Board and FSLIC to prop up the failing thrift industry actually aggravated its decline by papering over inadequate reserves and encouraging thrifts to engage in risky loans and investments. *See Transohio Savings Bank v. Director, Office of Thrift Supervision,* 967 F.2d 598, 602 (D.C. Cir. 1992); House Report at 298–99, *reprinted in* 1989 U.S.C.C.A.N. at 94–95. By 1988, FSLIC was insolvent by over $50 billion. *See* House Report at 304, *reprinted in* 1989 U.S.C.C.A.N. at 100. In response to this situation, and to restore the strength of the thrift industry and the deposit insurance fund, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act, Pub. L. No. 101–73, 103 Stat. 183 (1989) ("FIRREA"). *See* House Report at 291, *reprinted in* 1989 U.S.C.C.A.N. at 87. FIRREA was adopted, inter alia, to "promote, through regulatory reform, a safe and stable system of affordable housing finance," to "improve the supervision of savings associations by strengthening capital, accounting, and other supervisory standards," and to "curtail investments and other activities of savings associations that pose unacceptable risks to the Federal deposit insurance funds." FIRREA, § 101(1)–(3), 103 Stat. at 187 (codified at 12 U.S.C. § 1811 note (1994)).

FIRREA abolished both FSLIC and the Bank Board. FSLIC's thrift deposit insurance function was assumed by the Federal Deposit Insurance Corporation

("FDIC"), which became the manager of the new "Savings Association Insurance Fund." *See* 12 U.S.C. § 1811(a) (1994); H.R. Conf. Rep. No. 101–222, at 393, 394 (1989), *reprinted in* 1989 U.S.C.C.A.N. 432, 433 ("House Conference Report") (FIRREA gives FDIC "the duty of insuring the deposits of savings associations as well as banks."). In addition, FIRREA created a separate fund under the management of the FDIC called the FSLIC Resolution Fund. *See* 12 U.S.C. § 821a. The FSLIC Resolution Fund generally assumed all of the "assets and liabilities" of FSLIC as of the day before its abolition. *Id.* § 1821a(a)(2).

Each of the Bank Board's principal functions was transferred to a different agency upon its dissolution: (1) the supervision and regulation of the thrift industry was transferred to the Office of Thrift Supervision ("OTS") in the Department of the Treasury, *see* 12 U.S.C. § 1462a(e) (1994); 12 U.S.C. § 1813(q) (1994); House Conference Report at 404, *reprinted in* 1989 U.S.C.C.A.N. at 443; House Report at 453, *reprinted in* 1989 U.S.C.C.A.N. at 249; (2) the management and regulation of thrift deposit insurance through FSLIC was transferred to the FDIC, *see* 12 U.S.C. § 1811; (3) the oversight and supervision of the twelve regional Federal Home Loan Banks was transferred to the Federal Housing Finance Board, *see* 12 U.S.C. § 1422a (1994); 12 U.S.C. § 1422b (1994); and (4) the liquidation of the assets of failed thrifts was transferred to the Resolution Trust Corporation ("RTC") for those thrifts that became insolvent between 1989 and 1995, *see* 12 U.S.C. § 1441a. *See also* House Conference Report at 408–09, *reprinted in* 1989 U.S.C.C.A.N. at 447–48; *see generally American Fed'n of Gov't Employees, Local 3295 v. Federal Labor Relations Auth.*, 46 F.3d 73, 74 & n.1 (D.C. Cir. 1995); *Employment Status of the Members of the Board of Directors of the Federal Housing Finance Board*, 14 Op. O.L.C. 127 (1990).

FIRREA also required OTS to prescribe at least three capital requirements for thrifts—a leverage limit requiring thrifts to maintain core capital of at least three percent of the thrift's total assets; a tangible capital requirement of at least one-and-a-half percent of the thrift's total assets; and a risk-based capital requirement aligned with the risk-based capital requirement for national banks. *See* 12 U.S.C. § 1464(t)(1)–(2), (9) (1994). In addition, FIRREA gradually phased out over a five-year period the ability of thrifts to include "qualifying supervisory goodwill" in calculating core capital. *Id.* § 1464(t)(3)(A). Under FIRREA, OTS promulgated regulations equating capital credits with supervisory goodwill, thereby excluding such credits from satisfying the capital requirements. 12 C.F.R. § 567.1(w) (1990). As a result of these new strict requirements, "many institutions immediately fell out of compliance with regulatory capital requirements, making them subject to seizure by thrift regulators." *Winstar*, 518 U.S. at 858 (plurality opinion).

## C. *United States v. Winstar*

The Supreme Court's *Winstar* decision addressed the consequences of the new capital requirements on three different institutions—Glendale Federal Bank, FSB, Winstar Corporation, and The Statesman Group, Inc.—that were parties to supervisory mergers. All three claimed financial losses due to the change in the regulatory structure caused by FIRREA, and they filed suit against the United States in the Court of Federal Claims on both contractual and constitutional theories. That court granted the plaintiffs' motions for partial summary judgment on contract liability because it found that the government had breached contractual obligations to permit the plaintiffs to count supervisory goodwill and capital credits toward their capital requirements. *Statesman Sav. Holding Corp. v. United States*, 26 Cl. Ct. 904 (1992) (granting summary judgment on liability to Statesman and Glendale); *Winstar Corp. v. United States*, 25 Cl. Ct. 541 (1992) (finding contract breached and entering summary judgment on liability); *Winstar Corp. v. United States*, 21 Cl. Ct. 112 (1990) (finding an implied-in-fact contract but requesting further briefing on other contract issues). After the cases were consolidated, a divided panel of the Federal Circuit reversed, holding that the parties did not clearly assign the risk of a subsequent change in the regulatory capital requirements to the government. *Winstar Corp. v. United States*, 994 F.2d 797, 811–13 (Fed. Cir. 1993). After rebriefing and reargument, the Federal Circuit, sitting *en banc*, reversed the panel and affirmed the CFC's rulings on liability, concluding that FIRREA breached the government's prior contractual obligations and that the government therefore was liable in money damages for the breach. *Winstar Corp. v. United States*, 64 F.3d 1531 (Fed. Cir. 1995) (en banc).

Writing for a plurality of four,[7] Justice Souter first described the merger between Glendale and the First Federal Savings and Loan Association of Broward County, a thrift whose liabilities exceeded the fair value of its assets by over $700 million. FSLIC entered into a "Supervisory Action Agreement" ("SAA") with Glendale. *Winstar*, 518 U.S. at 861 (plurality opinion). The SAA contained an integration clause that, according to the plurality, incorporated by reference the Bank Board's resolution approving the merger, which in turn referred, inter alia, to a document stipulating that any supervisory goodwill would be treated in accordance with Bank Board Memorandum R–31b. That memorandum permitted the use of the purchase method of accounting and the recognition of supervisory goodwill as an asset subject to amortization. One of the reasons that the plurality interpreted the integration clause in the SAA to include the Board's resolutions and memoranda was that it would have been "irrational" for Glendale to enter into an agreement that immediately made it insolvent unless it obtained a contractual commitment that the policies identified in the resolutions and memoranda would continue.

---

[7] Justice Souter was joined by only two other Justices in two subsections of his opinion that discussed the government's "sovereign acts" defense. 518 U.S. at 896–903.

*Id.* at 862–63. The plurality agreed with the Federal Circuit's judgment that " 'the government had an express contractual obligation to permit Glendale to count the supervisory goodwill generated as a result of its merger with Broward as a capital asset for regulatory capital purposes.' " *Id.* at 864 (quoting *Winstar Corp. v. United States*, 64 F.3d at 1540).[8]

The Winstar merger resulted from FSLIC actively soliciting bids for the acquisition of Windom Federal Savings and Loan Association, a failing thrift. *Id.* (plurality opinion). FSLIC and Winstar Corporation, a group of private investors formed for the purpose of acquiring Windom, entered into an "Assistance Agreement" ("AA") under which FSLIC agreed to contribute $5.6 million in cash to the acquisition. The AA contained an integration clause that, according to the plurality, also incorporated the Bank Board's approval resolution and a forbearance letter signed by the Bank Board permitting the amortization of supervisory goodwill over thirty-five years. *Id.* Again, the plurality noted that it was apparent that " 'the intention of the parties [was] to be bound by the accounting treatment for goodwill arising in the merger.' " *Id.* at 866 (quoting *Winstar Corp. v. United States*, 64 F.3d at 1544).

When Statesman asked FSLIC for government assistance in purchasing a subsidiary of an insolvent thrift, FSLIC responded that it could only obtain such assistance if it purchased the parent thrift as well as three other unstable thrifts. Statesman and FSLIC entered into an AA under which FSLIC contributed $60 million to the acquisition, $26 million of which could be treated as a permanent capital credit for purposes of the regulatory capital requirement. Like the transactions with Glendale and Winstar, the plurality found that the AA contained an integration clause incorporating contemporaneous resolutions and letters issued by the Bank Board approving the use of supervisory goodwill to be amortized over a long period (this time twenty-five years). *Id.* at 867. Once again, the plurality accepted the Federal Circuit's finding that " 'the government was contractually obligated to recognize the capital credits and the supervisory goodwill generated by the merger.' " *Id.* (quoting *Winstar Corp. v. United States*, 64 F.3d at 1543).

Justice Souter, writing for the plurality, rejected the government's various common law defenses and held that the United States was liable for breach of contract. In characterizing the contracts at issue, the plurality emphasized that "[n]othing in the documentation or the circumstances of these transactions purported to bar the Government from changing the way in which it regulated the thrift industry." *Id.* Rather, Justice Souter explained:

---

[8] The government's petition for a writ of certiorari did not directly contest the existence of contracts between the government and plaintiffs, and therefore the question was not technically before the Court *See* 518 U.S. at 860–61 (plurality opinion); *United States v Winstar Corp*, 64 F 3d 1531 (Fed Cir 1995) (en banc), *petition for cert filed*, 64 U S L W. 3486 (U S Dec 1, 1995) (No 95–865) (listing as "questions presented" whether unmistakability doctrine, reserved powers doctrine, or sovereign acts doctrine should bar enforcement of alleged contracts) The Federal Circuit and the Court of Federal Claims, however, both found that contracts existed in the three transactions at issue in *Winstar, see Winstar Corp. v United States*, 64 F 3d at 1545, and the plurality seemed to accept the Federal Circuit's characterization of the contracts

> We read this promise as the law of contracts has always treated
> promises to provide something beyond the promisor's absolute con-
> trol, that is, as a promise to insure the promisee against loss arising
> from the promised condition's nonoccurrence. Holmes's example
> is famous: "[i]n the case of a binding promise that it shall rain
> tomorrow, the immediate legal effect of what the promisor does
> is, that he takes the risk of the event, within certain defined limits,
> as between himself and the promisee."

*Id.* at 868–69 (plurality opinion) (footnote omitted) (quoting Holmes, *The Common Law* (1881) in 3 The Collected Works of Justice Holmes 268 (S. Novick ed. 1995)). In other words, "the Bank Board and FSLIC . . . assumed the risk [that the law would] change," *id.* at 908 (plurality opinion), *see id.* at 883 (plurality opinion), and agreed to pay plaintiffs for the losses, if any, caused by such a change, *see id.* at 887 (plurality opinion) ("[T]he Government agreed . . . to indemnify its contracting partners against financial losses arising from regulatory change."). *See also id.* at 890 (plurality opinion). The plurality found that, "[w]hen the law as to capital requirements changed . . . the Government was unable to perform its promise and, therefore, became liable for breach." *Id.* at 870.

Justice Scalia, writing for himself and two other Justices, concurred in the judgment. He agreed with the plurality "that the contracts at issue in this case gave rise to an obligation on the part of the Government to afford respondents favorable accounting treatment, and that the contracts were broken by the Government's discontinuation of that favorable treatment, as required by FIRREA." *Id.* at 919 (Scalia, J., concurring). He also agreed that by promising to regulate the plaintiffs in a particular fashion into the future, "the Government had assumed the risk of a change in its laws." *Id.* at 924.

However, Justice Scalia disagreed with the approach used by the plurality to reject the government's "unmistakability" and "sovereign acts" defenses. According to Justice Scalia, by characterizing the contracts at issue as merely insurance against the contingency that the regulations might change, rather than as promises not to change the regulations, the plurality had incorrectly avoided making the determination whether the government was entitled to assert these defenses to contractual liability. *Id.* at 919. Justice Scalia argued that prior precedent had not made the availability of these defenses dependent upon the nature of the underlying contract, *id.*, and he suggested that, in any event, the contracts did appear to constrain the sovereign authority of the government insofar as they required the government to pay damages for undertaking a sovereign act. *Id.* at 919–20. With respect to this latter point, he added that "[v]irtually every contract operates, not as a guarantee of particular future conduct, but as an assumption of liability in the event of nonperformance: 'The duty to keep a contract at

common law means a prediction that you must pay damages if you do not keep it,—and nothing else.' " *Id.* at 919 (quoting Holmes, *The Path of the Law* (1897), in 3 The Collected Works of Justice Holmes 391, 394 (S. Novick ed. 1995)). Nevertheless, Justice Scalia concluded that the government's contractual undertaking was sufficiently clear to overcome the "unmistakability" and "sovereign acts" defenses. *Id.* at 919–22, 923–24. He also concluded that, because the plaintiffs did not seek to enjoin the exercise of sovereign authority, but rather to receive damages for breach of contract, there was no force to the government's "reserved powers" defense, which he described as "[s]tand[ing] principally for the proposition that certain core governmental powers cannot be surrendered." *Id.* at 922–23. Finally, Justice Scalia rejected the government's defense that there was no "express delegation" of authority permitting the restraint of sovereign power. *Id.* at 923.

Although the plurality and Justice Scalia may have differed in their characterization of the relevance of the nature of the underlying contracts to the availability of certain governmental defenses, they agreed that the government had assumed the risk of regulatory change. They also were in general agreement on what constituted the breach of contract: the plurality adopted the Federal Circuit's conclusion that the breach occurred when, pursuant to the new requirements imposed by FIRREA, the federal regulatory agencies limited the use of supervisory goodwill and capital credits, *id.* at 870, and Justice Scalia found that the enactment and implementation of FIRREA gave rise to plaintiffs' claims of breach of contract. *Id.* at 920. Finally, both the plurality and Justice Scalia found that the Bank Board and FSLIC had sufficient authority to enter into the contracts: "the Bank Board and FSLIC had ample statutory authority to . . . promise to permit respondents to count supervisory goodwill and capital credits toward regulatory capital and to pay respondents' damages if that performance became impossible." *Id.* at 891 (plurality opinion); *see also id.* at 923 (Scalia, J., concurring) ("[W]hatever is required by the 'express delegation' doctrine is to my mind satisfied by the statutes which the principal opinion identifies as conferring upon the [Bank Board and FSLIC] authority to enter into agreements of the sort at issue here."). For such authority, the Court pointed both to FSLIC's statutory authority to enter into contracts under 12 U.S.C. § 1725(c) (1988) (repealed 1989), and to its authority in certain circumstances to guarantee an acquiring institution against certain losses in order to facilitate a merger or consolidation with a failed or failing thrift under 12 U.S.C. § 1729(f)(2) (1988) (repealed 1989). 518 U.S. at 890 (plurality opinion); *id.* at 923 (Scalia, J., concurring).

## II. ANALYSIS

We understand that currently pending before the Court of Federal Claims and the Federal Circuit are more than one hundred cases premised on identical or

similar theories of relief as the three cases at issue in *Winstar*. We further under-
stand that some of these cases involve AA's or SAA's entered into by FSLIC,
and that FSLIC was involved in some but not all of the remaining cases. We
address here only those cases in which FSLIC was a party to an AA or SAA.
*See supra* p. 142.

There are two potential sources for the payment of judgments (or settlements)
against the government in the cases considered here: the Judgment Fund or the
FSLIC Resolution Fund. The "Judgment Fund" is a permanent and indefinite
appropriation established by Congress in 1956 to pay certain final judgments,
awards, compromise settlements, and interest and costs. The Automatic Payment
of Judgments Act, ch. 748, § 1302, 70 Stat. 678, 694–95 (1956) (codified as
amended at 31 U.S.C. § 1304). The Judgment Fund may be used to pay certain
judgments and settlements when payment is "not otherwise provided for." *Id.*
The question for our purposes is whether Congress "otherwise provided for" the
payment of judgments and settlements in the *Winstar*-related cases addressed in
this memorandum when it created the FSLIC Resolution Fund in 1989 to assume,
with a single statutory exception that is not applicable here, 12 U.S.C. § 1441a,
"all assets and liabilities of the FSLIC on the day before" FSLIC was abolished,
12 U.S.C. § 1821a(a)(2).

## A. Availability of the Judgment Fund

Prior to the creation of the Judgment Fund, many agencies had to seek specific
appropriations from Congress to pay judgments and settlements because agency
operating appropriations are not generally available to make such payments. As
a result of this burdensome process, payments were often unduly delayed, causing
excess charges for post-judgment interest. *See Availability of the Judgment Fund
for the Payment of Judgments or Settlements in Suits Brought Against the Com-
modity Credit Corporation Under the Federal Tort Claims Act*, 13 Op. O.L.C.
362, 363 (1989) ("CCC Opinion"). The Judgment Fund addressed this problem
by eliminating the need for Congress to pass specific appropriations bills for the
payment of judgments and settlements that were not "otherwise provided for."
31 U.S.C. § 1304; *see* CCC Opinion at 363; 3 GAO Principles at 14–24 to 14–
26. This Office has explained that § 1304 was not "designed to shift liability
to the United States Treasury from agencies that had specific and express statutory
authority to pay judgments and settlements out of their own assets and revenues,
but rather to eliminate the need for Congress to pass specific appropriations bills
for the payment of judgments." CCC Opinion at 366.

Section 1304 provides in pertinent part:

> (a) Necessary amounts are appropriated to pay final judgments, awards, compromise settlements, and interest and costs specified in the judgments or otherwise authorized by law when—
>
> > (1) payment is not otherwise provided for;
> >
> > (2) payment is certified by the Secretary of the Treasury; and .
> >
> > (3) the judgment, award, or settlement is payable—
> >
> > > (A) under sections 2414, 2517, 2672, or 2677 of title 28; . . . .

31 U.S.C. § 1304(a) (1994 & Supp. II 1996). Thus a judgment or settlement may be paid out of the Judgment Fund only if three conditions are met: payment must not be ''otherwise provided for;'' the Secretary of the Treasury must certify payment; and the judgment must be payable pursuant to one of several specified statutory provisions.

Whether the Judgment Fund is available for payment of judgments and settlements in the *Winstar*-related cases addressed in this memorandum depends first upon whether such payment is ''otherwise provided for'' within the meaning of § 1304(a), i.e., whether there is another appropriation or fund that lawfully may be used for payment.[9] *See* 62 Comp. Gen. 12, 14 (1982); *see also* 3 GAO Principles at 14–25 (to determine whether Judgment Fund is available to pay a type of judgment that did not exist prior to the Fund's establishment, usually examine whether Congress has established a mechanism that is available for payment). Whether a payment is ''otherwise provided for'' is a question of legal availability rather than actual funding status. *See* Memorandum for Donald B. Ayer, Deputy Attorney General, from J. Michael Luttig, Principal Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Department of Energy Request to use the Judgment Fund for Settlement of Fernald Litigation* at 7 (Dec. 18, 1989) (''DoE Opinion'') (citing 66 Comp. Gen. 157, 160 (1986)); *accord* 3 GAO Principles at 14–26. The Judgment Fund does not become available simply because an agency may have insufficient funds at a particular time to pay a judgment. *See id.*; DoE Opinion at 7. If the agency lacks sufficient funds to pay a judgment, but possesses statutory authority to make the payment, its recourse is to seek funds from Congress. *See* DoE Opinion at 8; 3 GAO Principles at 14–26. Thus, if another appropriation or fund is legally available to pay a judgment or settlement, payment is ''otherwise provided for'' and the Judgment Fund is not available.

---

[9] Because we conclude that payment for the judgments and settlements at issue fails to meet the ''not otherwise provided for'' requirement in § 1304(a), we express no opinion as to whether that provision's other two requirements are met

## B. Availability of the FSLIC Resolution Fund

The FSLIC Resolution Fund ("FRF") is another possible source of payment for judgments against, or settlements by, the government, at least in the *Winstar*-related cases addressed in this memorandum. FIRREA simultaneously abolished FSLIC as of the date of enactment, August 9, 1989, and, except as provided in 12 U.S.C. § 1441a, transferred "all assets and liabilities of the [FSLIC] on the day before August 9, 1989" to the FRF, a separate fund to be managed by the FDIC.[10] 12 U.S.C. § 1821a(a)(2) (1994); *see* FIRREA § 401(a)(1) (codified at 12 U.S.C. § 1437 note (1994)). The FRF may not be commingled with any other FDIC funds or assets. *Id.* It was initially funded by FSLIC's transferred assets, income earned on those assets, certain liquidating dividends and payments on claims from receiverships, and borrowed funds. *Id.* § 1821a(b) (1994). From 1989 to 1992, the FRF was supplemented by certain assessments against members of the Savings Association Insurance Fund. *Id.* If these sources of funds "are insufficient to satisfy the liabilities of the FSLIC Resolution Fund, the Secretary of the Treasury shall pay to the Fund such amounts as may be necessary, as determined by the [FDIC] and the Secretary, for FSLIC Resolution Fund purposes." *Id.* § 1821a(c)(1) (1994). In addition, "[t]here are authorized to be appropriated to the Secretary of the Treasury, without fiscal year limitation, such sums as may be necessary to carry out [§ 1821a]." *Id.* § 1821a(c)(2) (1994). Because this language merely authorizes an appropriation, there would have to be an appropriation from which the Secretary of the Treasury could replenish the FRF. *See* 1 GAO Principles at 2–34 ("'The mere authorization of an appropriation does not authorize expenditures on the faith thereof . . . .'" (quoting 16 Comp. Gen. 1007, 1008 (1937)).

The question that we must answer in determining whether the FRF is available to pay judgments or settlements in the *Winstar*-related cases in which FSLIC was a party to an AA or SAA is one of congressional intent. We must decide whether Congress intended for the phrase "all assets and liabilities of the [FSLIC] on the day before August 9, 1989," which FIRREA transferred to the FRF, 12 U.S.C. § 1821a(a)(2), to encompass the kind of liability that would give rise to settlements by, or judgments against, the United States in *Winstar*-related cases of this type. If Congress did so intend, then the FRF is available to pay the judgments or settlements that arise out of such cases.[11] If not, then the FRF is not available to pay such judgments or settlements and, absent the existence of some other

---

[10] Section 1441a established the RTC and provided for its termination by December 31, 1995 *See* 12 U.S.C § 1441a(b) (1994), 12 U.S.C § 1441a(m)(1) (1994) Upon termination, all assets and liabilities of RTC were to be transferred to the FRF *Id* § 1441a(m)(2) If the RTC's assets exceeded its liabilities, FIRREA obligated the FRF to transfer any net proceeds from the sale of the assets to the Resolution Funding Corporation *Id*

[11] In addition to transferring the assets and liabilities of FSLIC to the FRF, it is clear that Congress also intended for judgments or settlements arising from the "liabilities of the [FSLIC]" to be paid out of the FRF *See* 12 U.S.C § 1821a(c) (providing for a "Treasury backup" if the funds in the FRF are insufficient to satisfy its liabilities), *id.* § 1821a(d) (limiting the payment of certain judgments to the assets of the FRF).

fund from which payment could be made, the Judgment Fund would be the appropriate source of payment.

We conclude that, in light of the relevant statutory text and legislative history, Congress intended the phrase "liabilities of the [FSLIC] on the day before August 9, 1989," 12 U.S.C. § 1821a(a)(2), to encompass the contingent liability that arose from the contractual obligations that, under the theory of liability set forth in *Winstar*, FSLIC had assumed prior to FIRREA's passage and that may, as a consequence of FIRREA's enactment and implementation, become definite liabilities resulting in judgments against, or settlements by, the United States. Our conclusion is based on three related determinations: (1) liability arising from AA's or SAA's to which FSLIC was a party constitute "liabilities *of the [FSLIC]*," *id.* (emphasis added), to the extent that the statutory term "liabilities" encompasses contingent liabilities; (2) the statutory phrase *"liabilities* of the [FSLIC]," *id.* (emphasis added), does encompass contingent liabilities arising from FSLIC contracts that may have created obligations leading to the payment of judgments or settlements by the United States in the class of *Winstar*-related litigation considered herein; and (3) the language "on the day before August 9, 1989," does not reflect Congress's intention to exclude contingent liabilities arising from such FSLIC agreements, even though it is the enactment of FIRREA, an event that took place after the "day before August 9, 1989," that might give rise to any such judgments or settlements. We therefore conclude that the FRF is the appropriate source of payment for such settlements or judgments. We note that our construction of § 1821a(a)(2) is consistent with the Tenth Circuit's decision in *Security Federal*, 25 F.3d 1493 (10th Cir. 1994).[12]

1.

It is our view that liabilities resulting from AA's or SAA's to which FSLIC was a party qualify as "liabilities *of the [FSLIC]*," 12 U.S.C. § 1821a(a)(2) (emphasis added), to the extent that the term "liabilities" encompasses contingent liabilities. As we have explained, the Supreme Court's decision in *Winstar* held the government liable insofar as the enactment and implementation of FIRREA resulted in the breach of AA's and SAA's that had been entered into with various plaintiffs. The Court concluded that these contracts provided for the assumption of the risk of regulatory change and constituted promises to pay plaintiffs damages

---

[12] The Tenth Circuit held in that case that the FRF is the appropriate source for payment of a judgment resulting from the breach of contractual obligations incurred by FSLIC where the breach occurred after FSLIC's abolition *Id* In reaching that conclusion, the court of appeals relied on §§ 1821a(a) and 1821a(d) to hold that the restitution to which the plaintiff investors were entitled should be paid from the FRF rather than the RTC's assets: "Because FIRREA designates the FSLIC Resolution Fund as the successor to FSLIC rights and obligations and limits recovery to the Fund's assets, the Fund is the proper source of restitution to the Investors." *Id.* at 1506; *cf* Helfer Letter (concluding that under § 1821a(d), the FRF rather than the Judgment Fund was the proper source for payment of the judgment in *Security Federal* because FDIC, FSLIC and FRF were all named defendants, the court ordered payment of the judgment from the FRF, and the case involved an AA negotiated and executed by FSLIC)

in case of breach. Under the theory of liability recognized in *Winstar*, a demonstration that the governmental party to the AA's or SAA's had the statutory authority to enter into them is critical to any claim that may be brought to enforce them. *Winstar*, 518 U.S. at 890–91 (plurality opinion); *id.* at 923 (Scalia, J., concurring). The Supreme Court recognized in *Winstar* that FSLIC had such authority to enter into agreements that provided for the assumption of the risk of regulatory change. *See id.* at 890 (plurality opinion); *see also id.* at 923 (Scalia, J., concurring). Accordingly, to the extent that the governmental liabilities arising out of these agreements in the *Winstar*-related cases constitute "liabilities" within the meaning of § 1821a(a)(2), it is fair to treat them as liabilities "of the [FSLIC,]" as any governmental obligation to pay, or settlement premised on such an obligation, would arise from contracts entered into by FSLIC.

Moreover, we do not believe that, for purposes of determining the statutory source of payment, such liabilities could be attributed to the Bank Board. In contrast to FSLIC, which exercised its contracting power in forging the underlying agreements, it is our understanding that, in the cases considered in this memorandum, the Bank Board was "acting through" FSLIC's authority to contract, *Winstar*, 518 U.S. at 890 (plurality opinion), and was not exercising authority in connection with the agreements that are the subject of this memorandum other than in its capacity as the "operating head" of FSLIC. House Report at 424, *reprinted in* 1989 U.S.C.C.A.N. at 220; *see* 12 U.S.C. § 1725(a) (1988) (repealed 1989) (establishing FSLIC "under the direction of" the Bank Board). Accordingly, for purposes of construing the statutory provision that established the FRF, any liabilities resulting from the agreements would be "liabilities" of FSLIC, rather than of the Bank Board.[13]

We also believe that, in light of the quasi-corporate nature of FSLIC, Congress would have intended to treat these liabilities as "liabilities of the [FSLIC.]" This conclusion is supported by the fact that Congress does not ordinarily intend for the Judgment Fund to serve as the source of payment for liabilities that result from the breach of contractual obligations of governmental entities such as FSLIC. Instead, Congress ordinarily expects that such liabilities will be paid out of the

---

[13] At least for purposes of § 1821a(a)(2), the fact that the "United States" appears as the defendant in the *Winstar*-related cases does not make any liabilities resulting from FSLIC agreements liabilities of the United States as a whole rather than of FSLIC. The styling of the captions in these cases simply reflects the requirement that all cases brought in the CFC must be brought against the "United States," *see* 28 U S C § 1491(a) (1994), a requirement that obtains without regard to the source from which payments would be made for any liability that results from such litigation Although 12 U.S C § 1821a(d) defines one class of judgments payable from the FRF as those "resulting from a proceeding to which [FSLIC] was a party prior to its dissolution or which is initiated against the [FDIC] with respect to [FSLIC] or with respect to the FSLIC Resolution Fund," we do not believe that this provision limits the liabilities transferred to the FRF to those resulting from actions in which FSLIC or the FDIC was named as a defendant Instead, it is clear that, in light of the text, structure, and legislative history of § 1821a(d), Congress did not intend for this provision to limit the class of payable FSLIC liabilities, but rather to insure that the FDIC would only use FRF funds to pay those FSLIC liabilities that had been transferred to the FRF *See* S Rep No. 101–19, at 319 (section 1821a(d) "insulates the FDIC and the other funds it manages from liabilities of FSLIC that are transferred to the [FRF]"), *see also* House Report at 335, *reprinted in* 1989 U S.C C A N at 131 ("Any judgment resulting from          any action which is initiated against the FDIC based upon FSLIC actions is limited to the assets of the FSLIC Resolution Fund ")

separate funds of such governmental entities. Accordingly, it seems entirely logical to conclude that Congress intended for the FRF to serve as the source of payment for all those liabilities that Congress, had it not abolished FSLIC, would have expected FSLIC to have paid out of its own funds. The FRF, after all, is the fund that Congress established in order to succeed generally to all of the assets and liabilities of FSLIC.

Our determination that FSLIC is the type of governmental entity that Congress ordinarily would expect to use its own funds to pay for liabilities resulting from the breach of its contractual obligations stems from both its statutory designation as a "government corporation" and an examination of the functions that it performs. For example, the General Accounting Office ("GAO") has generally found that judgments against a government corporation, such as FSLIC, *see* 31 U.S.C. § 9101(3)(E) (1988) (repealed 1989) (listing FSLIC as a wholly-owned government corporation), should be paid from the corporation's own funds:

> The theory is that a government corporation is set up to operate in a business-like manner. It is usually given considerable latitude in determining its expenditures; it is free of many of the restrictions on appropriated funds that apply to noncorporate agencies; and its statutory charter typically contains a 'sue and be sued' clause. Of particular relevance . . . a corporation may generally retain funds it receives in the course of its operations and is not required to deposit them in the Treasury as miscellaneous receipts. Also, unlike a regular government agency, a government corporation may procure liability insurance. This being the case, it is logical that losses incurred by a government corporation, whether by judgment or otherwise, should be treated as liabilities of the corporation and charged to corporate funds.

3 GAO Principles at 14–36.

This Office has not expressly considered or adopted GAO's reasoning regarding the appropriate source for payment of judgments against a government corporation. Our approach has been to focus on case-specific determinations of congressional intent. In *Availability of the Judgment Fund for the Payment of Judgments or Settlements in Suits Brought Against the Commodity Credit Corporation Under the Federal Tort Claims Act*, 13 Op. O.L.C. 362 (1989), for example, we analyzed whether the Judgment Fund was available to pay settlements for suits brought against the Commodity Credit Corporation ("CCC") under the Federal Tort Claims Act ("FTCA"), by searching for indications that Congress intended for the CCC to discharge its own debts, including judgments against it, from its own funds. *Id.* at 367. As evidence of such intent, we noted that: (1) for the first fifteen years of its existence, the CCC operated largely in a private manner; (2)

like similar government corporations, the CCC was exposed to legal liability through a sue-and-be-sued clause; and (3) the CCC was authorized to " 'determine the character of and the necessity for its obligations and expenditures and the manner in which they shall be incurred, allowed, and paid' " and to " 'make final and conclusive settlement and adjustment of any claims by or against the Corporation.' " *Id.* (quoting 15 U.S.C. § 714b(j), (k)). We found that "[s]ince the CCC thus has the authority to apply its own funds to the payment of 'any' of its judgment claims, it follows that the CCC's obligations arising from FTCA may be paid from corporate funds. Accordingly, payment of such FTCA judgments against the CCC is 'otherwise provided for' within the meaning of 31 U.S.C. § 1304(a)(1), and the Judgment Fund is not available for that purpose." *Id.*

The common thread running through our and the GAO's analysis is that, in determining whether Congress intended for an entity to pay judgments from its own funds, relevant considerations include whether: Congress has designated the entity as a government corporation; the government corporation operates in a private, or "business-like," manner, as evidenced by, for example, its latitude to determine its expenditures, its exemption from the normal restrictions on appropriated funds, or the type of program it runs; the government corporation is exposed to legal liability through a sue-and-be-sued clause; and the government corporation has a revolving fund through which it may retain funds received in the course of its income-generating operations and spend those funds on day-to-day expenses.

We believe that the relevant circumstances indicate that Congress intended for FSLIC to pay judgments against it from its own funds. Congress expressly designated FSLIC as a government corporation. *See* 31 U.S.C. § 9101(3)(E) (1988) (repealed 1989). In addition, while FSLIC in part performed an inherently governmental function in its role as a regulator of the thrifts, the deposit insurance function it performed was one that could have been performed by the private sector. FSLIC had considerable latitude to determine its necessary expenditures and could operate without considering the usual statutory provisions regarding the use of appropriated funds. *See* 12 U.S.C. § 1725(c)(5) (1988) (repealed 1989) (requiring FSLIC to "determine its necessary expenditures . . . and the manner in which the same shall be incurred, allowed, and paid, without regard to the provisions of any other law governing the expenditure of public funds"). FSLIC also operated like a private business in that its real property was subject to state or local taxes. *See id.* § 1725(e). And FSLIC could sue and be sued. *See FDIC v. Meyer,* 510 U.S. 471, 475 (1994) (citing 12 U.S.C. § 1725(c)(4) (1988)). Finally, FSLIC's insurance fund operated as a revolving fund—paying for both its current operating expenses and defaults on depositors' accounts out of premiums levied on the institutions it insured, without having to deposit its funds in the Treasury as miscellaneous receipts. *See* 12 U.S.C. § 1727(b) & (c) (1988) (repealed 1989) (providing for payment of premiums to FSLIC by insured institutions); *id.* § 1725(d)

(1988) (repealed 1989) ("Moneys of [FSLIC] not required for current operations shall be deposited in the Treasury of the United States, or upon the approval of the Secretary of the Treasury, in any Federal Reserve bank, or shall be invested in obligations of, or guaranteed as to principal and interest by, the United States."); *id.* § 1728 (1988) (repealed 1989) (providing for payment of insurance by FSLIC). Thus, it appears that Congress would have expected the liabilities of FSLIC that resulted from breaches of contracts into which FSLIC had entered to have been paid from FSLIC's insurance fund, and that Congress would have expected the liabilities at issue here to have been paid from that fund if they had become definite prior to FSLIC's abolition.

2.

There remains, then, the question whether the statutory term "liabilities" should be construed to encompass not only definite liabilities, such as a final judgment entered prior to FSLIC's abolition as the consequence of an AA or SAA entered into by FSLIC, but also such contingent liabilities as a contractual obligation that FSLIC had assumed in an AA or SAA but that had not been breached prior to the time FIRREA abolished FSLIC. FIRREA does not define the term "liabilities" in the phrase "liabilities of the [FSLIC]," 12 U.S.C. § 1821a(a)(2), but it is well-established that "the starting point for interpreting a statute is the language of the statute itself. Absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980). In accord with this interpretive principle, the Supreme Court has explained that when a word or phrase in a statute has not been defined by Congress, it should ordinarily be construed in accordance with "its ordinary or natural meaning." *FDIC v. Meyer*, 510 U.S. at 476 (relying on Black's Law Dictionary for the ordinary meaning of a term).

In ordinary usage, the term "liability" is "a broad legal term [that] has been referred to as of the most comprehensive significance, including almost every character of . . . responsibility, absolute, contingent, or likely." Black's Law Dictionary 914 (6th ed. 1990); *see id.* (liability "has been defined to mean: all character of debts and obligations . . . an obligation which may or may not ripen into a debt; any kind of debt or liability, either absolute or contingent, express or implied; condition of being actually or potentially subject to an obligation; condition of being responsible for a possible or actual loss, penalty, evil, expense, or burden; . . . every kind of legal obligation, responsibility or duty . . . present, current, future, fixed or contingent debts") (citations omitted); *cf.* Webster's Third New International Dictionary 1302 (1986) (defining "liability" as "the quality or state of being liable" and defining "liable" as "bound or obligated according to law or equity: responsible, answerable")); *Montauk Oil Transp. Corp. v. Tug*

159

*"El Zorro Grande,"* 54 F.3d 111, 114 (2d Cir. 1995) (quoting Black's Law Dictionary as support for reading the term "liabilities" in a statute broadly to encompass civil penalties already imposed). Thus, the ordinary meaning of the term "liabilit[y]" strongly supports the conclusion that Congress intended the phrase "liabilities of the [FSLIC]" in § 1821a(a)(2) to include any contingent liability arising from promises made by FSLIC to insure against the risk of regulatory change, even though that liability had not become definite by the time of FSLIC's abolition.

Of course, we do not mean to suggest that the term "liabilities" is invariably best construed, regardless of context, to include contingent liabilities arising from agreements that have provided for the assumption of the risk of events that have not yet occurred. Here, however, the overall statutory context counsels in favor of giving the term "liabilities" its ordinary, expansive meaning. When FIRREA abolished FSLIC, it designated where the functions and the assets and liabilities of FSLIC would be transferred. *See supra*, p. 146–47; *see also* House Report at 438, *reprinted in* 1989 U.S.C.C.A.N. at 234 (explaining that the FRF "will assume all the assets and liabilities of the FSLIC except for those expressly transferred or assumed by the Resolution Trust Corporation"). Congress established the FRF to wind up all of FSLIC's affairs, *see* 12 U.S.C. § 1821a(f) (providing for dissolution of FRF "upon satisfaction of all debts and liabilities and sale of all assets"), and was careful not to extinguish existing obligations attributable to FSLIC's actions. *See* FIRREA, § 401(f) (codified at 12 U.S.C. § 1437 note (1994)) ("savings provision" explaining that the abolition of FSLIC "shall not affect the validity of any right, duty, or obligation of" FSLIC and providing for the continuation of all suits commenced against FSLIC). But nowhere in FIRREA did Congress expressly provide that it intended for the FRF to assume only definite, but not contingent, liabilities with respect to FSLIC.

It would be anomalous to conclude that Congress, in creating a detailed statutory framework intended to wind up the affairs of FSLIC, simply left unanswered the question where the contingent liabilities arising from FSLIC agreements that had not yet been breached should be transferred. This anomaly does not arise, however, if "liabilities" is construed consistent with its ordinary, broad meaning. For under such a construction, it is clear that Congress intended the FRF, which (with the sole exception of 12 U.S.C. § 1441a) Congress identified as the fund to which "all" of the FSLIC "liabilities" would be transferred, to be the source of payment for the subset of liabilities that were contingent prior to FSLIC's abolition.

Moreover, we have found no affirmative evidence in our review of the relevant legislative materials that Congress intended to exclude contingent liabilities from the "liabilities" that it plainly intended to transfer to the FRF. All of these materials are consistent with construing "liabilities" in a manner that would include the contingent liability attributable to the FSLIC agreements, and none provides a clear, contrary indication of congressional intent. In light of the expansive, ordi-

nary meaning of the term "liability," as well as the particular statutory context at issue here, the term "liabilities" in § 1821a(a)(2) should be construed to include the type of contingent liability that arose from AA's and SAA's that FSLIC entered into prior to its abolition. *See John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank*, 510 U.S. 86, 94–95 (1993) (in interpreting the meaning of a statutory provision, "we examine first the language of the governing statute, guided not by a single sentence or member of a sentence, but looking to the provisions of the whole law, and to its object and policy") (quotations and citations omitted).

Certainly the statutory provision that addresses payments from the FRF arising from "legal proceedings," 12 U.S.C. § 1821a(d), does not manifest an intention on the part of Congress to exclude liabilities that were only contingent at the time of FSLIC's abolition. Instead, that provision makes clear that Congress fully expected the FRF to be the source of payment for FSLIC liabilities that would arise from litigation commenced only after FSLIC had been abolished. Section 1821a(d) provides: "Any judgment resulting from a proceeding to which [FSLIC] was a party prior to its dissolution or which is initiated against the [FDIC] with respect to [FSLIC] or with respect to the FSLIC Resolution Fund shall be limited to the assets of the FSLIC Resolution Fund." 12 U.S.C. § 1821a(d). The plain language of this provision indicates that Congress contemplated that judgments resulting from cases initiated against the FDIC after the enactment of FIRREA with respect to FSLIC's pre-FIRREA activities would be paid from the FRF. That is to say, Congress must have intended for the "liabilities of the [FSLIC]" transferred to the FRF to include at least some potential judgments resulting from actions by FSLIC prior to its abolition, brought against the FDIC as the successor to FSLIC's obligations. 12 U.S.C. § 1821a(a)(2). Yet, in addressing the availability of the FRF to pay such future judgments, Congress did not purport to limit the class of payable "liabilities:" Instead, Congress employed the broad phrase "any judgment," which comports with the expansive, ordinary meaning of "liabilities" that we believe Congress intended to adopt in § 1821a(a)(2).

Nor can it be argued that the particular class of future judgments and settlements at issue here—judgments and settlements that may arise from contractual agreements assuming the risk of regulatory change that, by definition, had not been breached prior to FSLIC's abolition—were so far beyond the contemplation of Congress at the time that it established the FRF that it would be implausible to construe the term "liabilities" in § 1821a(a)(2) to encompass them. As Justice Souter explained in *Winstar*, the effect that the enactment of FIRREA might have on the agreements was a subject of "intense concern" in the congressional debate over the legislation. 518 U.S. at 902 (plurality opinion).[14] For example, "[o]pponents of FIRREA's new capital requirements complained that '[i]n its

---

[14] This section of Justice Souter's plurality opinion and the other portions of the opinion cited in this paragraph were joined by only two other Justices

present form, [FIRREA] would abrogate written agreements made by the U.S. government to thrifts that acquired failing institutions by changing the rules in the middle of the game.'" *Id.* at 900–01 (plurality opinion) (quoting 135 Cong. Rec. 12,145 (1989) (statement of Rep. Ackerman)). More generally, Justice Souter noted that the effect that the legislation might have on existing FSLIC contracts was "a focal point of the congressional debate," *id.* at 900 (plurality opinion), and that "Congress itself expressed a willingness to bear the costs at issue here when it authorized FSLIC to 'guarantee [acquiring thrifts] against loss' that might occur as a result of a supervisory merger." *Id.* at 883 (quoting 12 U.S.C. § 1729(f)(2) (1988) (repealed 1989)). Given the attention in Congress to the question whether FIRREA would abrogate the agreements to assume the risk of regulatory change, it would appear reasonable to construe "liabilities of the [FSLIC]" to encompass any liability that might result from the breach of those agreements.

Finally, the relevant legislative history does not demonstrate that Congress intended for "liabilities of the [FSLIC]" to exclude contingent liabilities. In accordance with the natural reading of the term "liabilities" in § 1821a(a)(2), the earlier versions of the provision reported out of both the Senate and House committees specified that the types of liabilities that the FRF would inherit included "debts, obligations, contracts and other liabilities of [FSLIC], matured or unmatured, accrued, absolute, contingent, or otherwise." S. Rep. No. 101–19, at 107–08 (Apr. 13, 1989); House Report at 64 (May 16, 1989) (identical language); *see also* S. Rep. No. 101–19, at 319 (explaining that "[t]he liabilities transferred include FSLIC's outstanding obligations under assistance agreements with acquirers of failing thrift institutions"); House Report at 334, *reprinted in* 1989 U.S.C.C.A.N. at 130 (explaining that the FRF "is the successor to the existing reserves and assets, debts, obligations, contracts and other liabilities of the FSLIC"). This explanatory language was deleted without any reference in the House Conference Report, and thus it could be argued that the deletion reflects Congress's intent to have adopted a narrower meaning of "liabilities" in the statute itself. We do not believe, however, that such a reading of the legislative history would be sound. To the contrary, the appearance of this broad description of liabilities in the Senate and House reports is consistent with the conclusion that Congress intended the term "liabilities" to retain its ordinary, and quite expansive, meaning, and that Congress simply deleted the explanatory language as unnecessary.

In evaluating the effect of the deletion of the explanatory language, we have reviewed the case law that concludes that Congress does not ordinarily "intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442–43 (1987); *see also Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 200 (1974) (Congress's deletion of provision "strongly militates against a judgment that Congress intended a result that it expressly declined to enact"). There are certainly situations in which the

deletion of language that has appeared in an earlier, unenacted version of the legislation may be read to signal Congress's intention to have enacted a provision with a different meaning. There are also situations, however, where the deletion of the language that appeared in earlier versions of the bill merely reflects Congress's intention to have avoided an unnecessary redundancy that would have resulted from the inclusion of the additional language. *See Gemsco, Inc. v. Walling*, 324 U.S. 244, 263–65 (1945) (rejecting argument that deletion in conference of an illustrative parenthetical phrase from a bill meant that Congress intended to circumvent the authority conferred by the bill where parenthetical had been both inserted and deleted without comment); *see also Erie R.R. v. Tompkins*, 304 U.S. 64, 72–73 & n.5 (1938) (overturning the Court's previous interpretation of § 34 of the Federal Judiciary Act in part because of the "research of a competent scholar, who examined the original document") (citing Charles Warren, *New Light on the History of the Federal Judiciary Act of 1789*, 37 Harv. L. Rev. 49, 51–52, 81–88, 108 (1923) (when the drafter of an amendment to § 34 replaced his original version's phrase "the Statute law of the several States in force for the time being and their unwritten or common law now in use, whether by adoption from the common law of England, the ancient statutes of the same or otherwise" with "laws of the several States," the latter was intended to be a concise summary that encompassed the former)).

Here, as we have explained, the ordinary meaning of the undefined term "liabilities" is perfectly consistent with the expansive descriptions of "liabilities" contained in the House and Senate reports.[15] In addition, the other indications of congressional intent that we have identified above do not suggest that Congress intended to depart from the ordinary meaning of "liabilities" in establishing the FRF. Indeed, they all suggest that Congress intended to ensure a comprehensive transfer to the FRF of all of the assets and liabilities that had formerly been FSLIC's. Accordingly, we believe that Congress would have indicated in some way its intention for the deletion of the explanatory language to exclude the ordinary meaning of the term "liabilities," rather than merely to eliminate redundancies, if it had intended that result. Thus, the legislative history concerning the use of the term "liabilities" in § 1821a(a)(2) is consistent with the conclusion that Congress intended for that term to retain its ordinary meaning.

---

[15] In reaching its conclusion in *Security Federal* that the FRF was the appropriate source of payment, the Tenth Circuit relied on the earlier, more complete, listing of the types of liabilities transferred to the FRF. *See* 25 F.3d at 1505 ("the FSLIC Resolution Fund . 'is the successor to the existing reserves and assets, debts, obligations, contracts and other liabilities of the FSLIC'" (quoting House Report at 334)). The court did not address, however, whether the deletion of that additional, descriptive language from the final version of § 1821a(a)(2), which uses only the term "liabilities," reflected Congress's intention to have adopted a narrower meaning of "liabilities"

3.

Although we believe that Congress intended the phrase "the liabilities of the [FSLIC]" to encompass contingent liabilities resulting from contracts in which FSLIC assumed the risk of regulatory change, we must still consider the effect of the remaining portion of the relevant statutory language—i.e., the portion of the statute that limits the liabilities of FSLIC to include only those that existed "on the day before August 9, 1989." It could be argued that the inclusion of this limiting language reflected Congress's intention to exclude liabilities resulting from breaches of contract caused by FIRREA's enactment and implementation, which, of course, occurred after August 8, 1989. Under that view, the phrase "liabilities of the [FSLIC]" on the day before it was abolished would encompass, for example, outstanding promissory notes for the cash assistance that FSLIC had promised to contribute to supervisory mergers. The phrase would not encompass mere contingent liabilities that were attributable to agreements by FSLIC that would not be breached until after August 8, 1989. We do not believe, however, that this argument has force.

As we have already explained, there is nothing in the term "liabilities" itself that would counsel in favor of construing it to exclude contingent liabilities resulting from FSLIC contracts that had not been breached as of August 8, 1989. Indeed, the ordinary meaning of that term points in the opposite direction, and we have found no evidence that Congress intended the date restriction in § 1821a(a)(2), i.e., the phrase "on the day before August 9, 1989," to limit the types of "liabilities" of FSLIC transferred to the FRF. We do not believe, for example, that Congress intended this date restriction to preclude the FRF from serving as the source of payment for judgments or settlements resulting from breaches of FSLIC agreements that occurred either on the date of FIRREA's enactment, or later, when FIRREA was implemented, and thus after "the day before August 9, 1989." Instead, we believe that the inclusion of the date restriction merely resulted from the timing of FSLIC's abolition; technically, FSLIC was abolished just after midnight on August 8, and thus the transfer to the FRF of FSLIC's liabilities as of midnight on August 8 makes sense as a matter of timing. Earlier versions of the bill reported out of both the House and Senate committees had used the phrase "[o]n the date of the dissolution of [FSLIC] in accordance with section 401 of [FIRREA]," *see* S. Rep. No. 101–19, at 107 (Apr. 13, 1989); House Report at 64 (May 16, 1989), and there is no indication in the House Conference Report that the substitution of "the day before August 9, 1989" for "the date of the dissolution of [FSLIC]" was intended to work any substantive change.

### III. CONCLUSION

We conclude, therefore, that the transfer of ''all assets and liabilities of the [FSLIC] on the day before August 9, 1989'' to the FRF included not only the transfer of those liabilities that were definite on the day before FSLIC was abolished by reason of a judgment, or that arose from a breach of a contractual obligation that occurred on or before that date, but also those contingent liabilities that resulted from FSLIC's earlier assumption of the risk of adverse changes in the regulatory structure and that became definite only after FSLIC had been abolished. 12 U.S.C. § 1821a(a)(2). Because the FRF inherited these contingent liabilities from FSLIC, it also inherited the corresponding duty to pay damages once the regulatory structure changed. Thus, the FRF is legally available to pay judgments resulting from proceedings seeking to enforce this duty, and any settlements based on the risk of such judgments. Because payment is ''otherwise provided for'' within the meaning of the Judgment Fund statute, the Judgment Fund is not available to pay such judgments and settlements. *See* 31 U.S.C. § 1304. In sum, we believe that the FRF is the appropriate source of funds to pay judgments and settlements in *Winstar*-related cases in which FSLIC was a party to an Assistance Agreement or Supervisory Action Agreement.

RANDOLPH D. MOSS
*Acting Assistant Attorney General*
*Office of Legal Counsel*
